942 F.2d 257
 William TORCHINSKY; Sylvia Torchinsky, Plaintiffs-Appellants,
v.
SIWINSKI, individually, and as Deputy Sheriff of Guilford
County, North Carolina; the County of Guilford,
North Carolina, Defendants-Appellees.
 No. 90-2660.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1990.
Decided Aug. 9, 1991.
 
 Arthur Alexander Vreeland, Carruthers & Roth, P.A., Greensboro, N.C., for plaintiffs-appellants.
 James Edwin Pons, Deputy County Atty., Guilford County Attys. Office, Greensboro, N.C., for defendants-appellees.
 Before PHILLIPS and WILKINSON, Circuit Judges, and MERHIGE, Senior District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This appeal illustrates the importance of qualified immunity in protecting law enforcement officers from litigation that could impair their ability to protect the public. In this case, Deputy Sheriff E.L. Siwinski sought the arrest of appellants William and Sylvia Torchinsky after the victim of a brutal assault identified them as his assailants. Siwinski's supervisor corroborated his judgment that he had probable cause to believe the appellants committed the assault. A magistrate confirmed those judgments by issuing arrest warrants against the appellants. In addition, the district court upon reviewing the evidence in this case determined that probable cause to arrest was present.
 
 
 2
 Under these circumstances, Siwinski acted with objective reasonableness and is thus entitled to immunity from appellants' § 1983 claim against him. We also conclude that appellants cannot recover against Siwinski's municipal employer under § 1983 because they have failed to prove that a policy or custom of the municipality caused the alleged deprivation of their rights. Finally, we hold that the district court properly declined to exercise pendent jurisdiction over appellants' state law claims. The judgment of the district court is thus affirmed.
 
 I.
 
 3
 On the morning of July 30, 1987, Deputy Siwinski, a detective with the Guilford County Sheriff's Department, was assigned to investigate an apparent assault on Bill Bull. After a neighbor had discovered Bull battered and bloodied outside his home earlier that morning, he had been transported to a hospital. At that time, Bull related to another deputy several conflicting accounts of how he was injured, including that he had been in an auto accident and that he had been assaulted in his home by two black males. At the hospital, Siwinski briefly interviewed Bull. Bull again indicated that an auto accident had caused his injuries. Siwinski, however, doubted this explanation because Bull's injuries were consistent not with an accident but rather with an assault. A visit to Bull's home strengthened Siwinski's belief that Bull had been the victim of an assault. There Siwinski found evidence of a struggle including broken furniture and two sets of bloody footprints on the porch, one set noticeably smaller than the other.
 
 
 4
 Siwinski then began interviewing Bull's acquaintances to determine who might have assaulted him. These acquaintances informed Deputy Siwinski that Bull was bisexual and had had a homosexual relationship with a man named "Stanley." The information Siwinski gathered led him to suspect that Stanley might have assaulted Bull and the detective sought to pursue this theory by interviewing Bull.
 
 
 5
 On the evening of July 31, Siwinski went to the hospital to interview Bull. Siwinski asked Bull whether Stanley had beaten him. Bull responded that "Bill Torchinsky" had assaulted him. Siwinski then confirmed with Bull that he was stating that Bill Torchinsky committed the assault. Siwinski had learned earlier in his investigation that Torchinsky and Bull were business partners. Acting on this information, Siwinski left the hospital around midnight and drove to the Torchinsky residence. Once there he observed that no vehicles were in the driveway and that the house appeared to be unoccupied.
 
 
 6
 On the morning of August 1, Siwinski conferred with his supervisor, Sergeant Richard Jackson. He told Jackson that Bull had identified Bill Torchinsky as his assailant and that no activity was apparent at the Torchinsky residence. In addition, Siwinski informed Jackson that Bull had earlier given differing accounts of how he sustained his injuries. Jackson directed Deputy Siwinski to reinterview Bull to determine whether he adhered to his implication of Bill Torchinsky. If so, Jackson instructed Siwinski to tape record Bull's statement.
 
 
 7
 Based on these instructions, Siwinski returned to the hospital later that same morning. Siwinski interviewed Bull with a nurse present. Bull stated that Bill Torchinsky as well as his wife Sylvia had beaten him. Bull also stated that he was involved sexually with both Torchinskys. The nurse confirmed that Bull identified the Torchinskys as his attackers and as his sexual partners. Siwinski next turned on his tape recorder and attempted to have Bull reiterate his statements.* At this point, however, Bull began to tire and become drowsy. In addition, Deputy Siwinski apparently had problems operating the tape recorder. Consequently, the detective was unable to record a complete version of Bull's statement.
 
 
 8
 After the interview, Siwinski again conferred with Sergeant Jackson about the investigation and played the interview tape for him. Jackson expressed his belief that probable cause was present. Siwinski then presented the evidence to a North Carolina state court magistrate who issued arrest warrants for Bill and Sylvia Torchinsky. On the afternoon of August 1, the Torchinskys were arrested. Later that evening, they were released on bond. One or two days later, Bull was informed that the Torchinskys had been arrested. Bull responded that the Torchinskys were not actually his attackers. Upon learning this information, the County District Attorney dismissed the charges against the Torchinskys.
 
 
 9
 On January 24, 1989 the Torchinskys sued Siwinski and Guilford County in federal district court alleging violations of 42 U.S.C. § 1983 and asserting various state law claims such as malicious prosecution. The district court granted summary judgment for the defendants on the § 1983 claim, ruling that Siwinski had probable cause to have the Torchinskys arrested, and that therefore no constitutional violation had occurred. Accordingly, the court also dismissed the § 1983 claim against the County. Finally, the district court declined to exercise pendent jurisdiction over the Torchinskys' state law claims.
 
 
 10
 The Torchinskys now appeal the district court's judgment.
 
 II.
 
 11
 To address the Torchinskys' § 1983 claim, we need not formally resolve, as the district court did, whether the Torchinskys were arrested without probable cause. Even if this was so, Siwinski could still be entitled to qualified immunity and the Torchinskys' suit would be barred. See, e.g., Lowrance v. Pflueger, 878 F.2d 1014, 1017 (7th Cir.1989). Thus, we need only determine whether Siwinski--a deputy sheriff performing within the normal course of his employment--acted with the objective reasonableness necessary to entitle him to qualified immunity. See, e.g., Osabutey v. Welch, 857 F.2d 220, 224 (4th Cir.1988). This determination is ultimately a question of law for this court. See Collinson v. Gott, 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring in the judgment).
 
 A.
 
 12
 The basic purposes of qualified immunity bear repeating. The grant of qualified immunity to government officials ensures that these officials can perform their duties free from the specter of endless and debilitating lawsuits. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Without such an immunity, the operations of government would be immobilized. "[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Id. These concerns are particularly acute when the officials are police officers investigating a crime of violence. The police must have the ability to move quickly to solve the crime before the evidence becomes stale, a victim-witness dies, or the perpetrator has a chance to repeat the crime. The ability of police officers to protect the public can be severely hampered, however, if their every decision is subject to second-guessing in a lawsuit.
 
 
 13
 To guard against these crippling effects, the Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." Anderson, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. Thus, a particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment. See, e.g., Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2737-38, 73 L.Ed.2d 396 (1982). "The entitlement is an immunity from suit rather than a mere defense to liability; ... it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).
 
 
 14
 Because qualified immunity is designed to shield officials not only from ultimate liability but also from the hardships of litigation itself, "the immunity shield is necessarily more protective than is the defense on the merits." Gott, 895 F.2d at 998. This broader protection is reflected in a test of "objective reasonableness" for entitlement to qualified immunity. See, e.g., Malley v. Briggs, 475 U.S. 335, 344, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986). This objective test involves an inquiry into whether a government official has violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738. Under this formulation, a plaintiff may prove that an official has violated his rights, but an official is nonetheless entitled to qualified immunity if a reasonable person in the "official's position could have failed to appreciate that his conduct would violate" those rights. Gott, 895 F.2d at 998. The very idea of reasonableness requires that courts accord interpretive latitude to official judgments. See Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir.1988). If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost.
 
 
 15
 The significance of these principles for this lawsuit is clear. In determining whether Siwinski is entitled to qualified immunity, the guiding principle is that "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Malley, 475 U.S. at 344-45, 106 S.Ct. at 1098.
 
 B.
 
 16
 Our evaluation of Siwinski's claim to qualified immunity involves two inquiries. We first address the significance to be accorded the district court's and the North Carolina magistrate's determinations that Deputy Siwinski acted with probable cause. We next examine whether a reasonable officer in Siwinski's position could have believed that probable cause existed.
 
 1.
 
 17
 It is noteworthy that two different judicial officers in separate proceedings determined that Siwinski had demonstrated probable cause to support the arrest of the Torchinskys. The federal district court reviewed the evidence and determined that summary judgment should be granted because Siwinski had indeed established probable cause. The standard for probable cause, as we have indicated, is more stringent than is the requirement for qualified immunity. Thus, the decision of a detached district judge that Siwinski satisfied the more stringent probable cause standard is plainly relevant to a showing that he met the lower standard of objective reasonableness required for qualified immunity. Indeed, one would affirmatively have to label the district court's probable cause determination unreasonable to conclude that Siwinski failed to act at least reasonably in the circumstances.
 
 
 18
 A second judicial officer, the North Carolina magistrate from whom Siwinski sought the arrest warrants, also held that he had demonstrated probable cause. We encourage law enforcement officers to seek warrants because magistrates from their detached perspective serve as the essential "checkpoint between the Government and the citizen." Steagald v. United States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983. Otherwise, the threat of liability would force officers to continuously second-guess the considered decisions of magistrates. This in turn would promote delay in the execution of warrants, and alter the proper allocation of law enforcement functions. See Ortiz v. Van Auken, 887 F.2d 1366, 1369 (9th Cir.1989). In our view then, Siwinski's actions in seeking the arrest warrants and the magistrate's determination of probable cause provide additional support for his claim that he acted with objective reasonableness. See, e.g., Massachusetts v. Sheppard, 468 U.S. 981, 988-91, 104 S.Ct. 3424, 3427-29, 82 L.Ed.2d 737 (1984).
 
 
 19
 The Torchinskys appear to argue that Siwinski cannot rely on the magistrate's probable cause determination because Siwinski allegedly omitted relevant information from his warrant applications. However, Siwinski testified at his deposition that he did provide the magistrate with all the information relevant to the case, including the fact that Bull had given various accounts of his injuries, information on Bull's condition while in the hospital, and that Bull specifically identified the Torchinskys as his attackers. The Torchinskys have proffered no evidence to rebut Siwinski's sworn statement, and we refuse to permit mere conjecture to upset the normal presumptions surrounding a warrant's validity. See, United States v. Colkley, 899 F.2d 297 (4th Cir.1990); Myers v. Morris, 810 F.2d 1437, 1457-58 (8th Cir.1987).
 
 2.
 
 20
 Of course, obtaining an arrest warrant does not provide per se evidence of objective reasonableness. Malley, 475 U.S. at 345-46, 106 S.Ct. at 1098. The presumption of reasonableness attached to obtaining a warrant can be rebutted where "a reasonably well-trained officer in [Siwinski's] position would have known that his [application] failed to establish probable cause and that he should not have applied for the warrant." Id. at 345, 106 S.Ct. at 1098. The Torchinskys argue that Siwinski acted unreasonably by basing his arrest warrant applications on an allegedly unreliable identification by Bull and on an allegedly inadequate investigation.
 
 
 21
 We disagree. Siwinski knew that Bull had been the victim of a brutal assault and he knew that Bull had identified the Torchinskys as his assailants. It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker. See, McKinney v. George, 726 F.2d 1183, 1187 (7th Cir.1984). Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself.
 
 
 22
 The Torchinskys argue, however, that Siwinski acted unreasonably in basing the arrest warrant applications on Bull's identification of them. First, they claim that Bull's statements were unreliable because the head injuries he suffered in the assault allegedly caused him to be incoherent during interviews. We find this contention to be illfounded because Siwinski scrupulously insured that Bull was coherent during questioning. For example, prior to the July 31 interview, the detective checked with hospital personnel to insure that Bull could be interviewed. In addition, prior to questioning Bull about the assault, Siwinski asked him questions to insure that he was oriented as to time and place and that he understood the nature of Siwinski's visit. Only after Deputy Siwinski was satisfied of Bull's lucidity did he begin to inquire about the assault. Siwinski followed similar safeguards as part of his interview with Bull on August 1.
 
 
 23
 Second, the Torchinskys contend that Siwinski acted unreasonably in relying on Bull's implication of them since he had offered differing statements about the cause of his injuries. In this regard, he had stated that his injuries were caused either by an auto accident or by two black males who had attacked him in his home. Under the circumstances, we believe Siwinski acted reasonably in relying on Bull's implication of the Torchinskys. Bull's other explanations of his injuries had been given just before and just after he was transported to the hospital at a time when he was still experiencing the shock and trauma of the assault. Siwinski could reasonably believe that Bull's implication of the Torchinskys, given two full days after the attack, was the most credible and reliable account of the events. In addition, an officer could reasonably believe that a victim might be initially reluctant to discuss, or even try to hide, the details of an assault that also involved the intimate details of his somewhat unusual sex life. Moreover, Bull's identification of the Torchinskys as his assailants fit the facts as Siwinski knew them: Bull knew the Torchinskys; he stated that he was having a sexual liaison with both of them which was consistent with his known sexual preferences; there were two sets of footprints at the crime scene, one set smaller than the other; and Bull had no obvious reason to falsely accuse the Torchinskys.
 
 
 24
 The Torchinskys' various contentions disregard the realities of police work that must inform qualified immunity analysis. Criminal investigations are often conducted under trying conditions over which officers have limited control. Here, for example, there was only one witness to a brutal attack, the victim himself. Ideally, of course, additional witnesses would have been available and the victim would not have been so brutalized. In reality, however, the police were compelled to take the victim as they found him and do the best they could under the circumstances.
 
 
 25
 Siwinski's conduct, moreover, did not reflect impulsive or reckless behavior. Siwinski consulted with his supervisor, Sergeant Jackson, not once but twice about the reliability of Bull's identification of the Torchinskys as well as the general course of the investigation. The appellants tend to make much of the doubts Jackson expressed about Siwinski's theory of the case given in his deposition testimony well after the outcome of the case was known. Because reasonableness is evaluated at the time the disputed actions were taken, this hindsight testimony is irrelevant. See Anderson, 483 U.S. at 639, 107 S.Ct. at 3038. What is relevant is the undisputed fact that Jackson, a certified instructor of criminal investigation techniques and a fifteen year veteran of detective work, expressed his belief to Siwinski that he had the probable cause necessary to support arrest warrants against the Torchinskys. A reasonable officer in Deputy Siwinski's position could view these consultations with Sergeant Jackson as additional confirmation that probable cause was present.
 
 
 26
 Finally, the Torchinskys argue that Siwinski is not entitled to qualified immunity because he relied on Bull's statement without interviewing them prior to seeking their arrests. We see two difficulties with their argument. For one, endorsing it would imply that whenever some question existed about the reliability of the identification of a suspect, the police must interview that suspect prior to arrest or later face the loss of immunity. We are skeptical of such a rule. There are, of course, many instances where pre-arrest interviews serve to confirm or dispel suspicion and where properly conducted conversations with suspects will prove an invaluable investigatory tool. There are also numerous reasons why a reasonable police officer might choose not to interview a suspect prior to arrest. For example, an officer might legitimately fear that questioning may alert a suspect that he is a target of an investigation, enabling him to destroy evidence or flee the jurisdiction before police have established probable cause for his arrest. The decision of whether or not to interview is inescapably discretionary, and we are reluctant to imply an abrogation of immunity on the sole basis of the absence of an interview.
 
 
 27
 A second difficulty with the Torchinskys' argument is its unconvincing reliance on Clipper v. Takoma Park, 876 F.2d 17 (4th Cir.1989). Clipper involved a police officer's failure to investigate readily available exculpatory evidence relating to the arrest of a suspect for bank robbery: statements of neighbors, identified by the suspect, who could have substantiated his alibi and bank surveillance camera photos of the robbery. This court held that the officer's failure to factor this evidence into his investigation substantiated the jury's conclusion that the officer acted without probable cause. Id. at 19-20.
 
 
 28
 In contrast to the officer in Clipper, Siwinski did not ignore readily available exculpatory evidence of which he had been made aware. The Torchinskys merely suggest that a reasonable officer who interviewed them would have instinctively concluded from their mild manner and slight appearance that they could not have assaulted Bull. It will, of course, always be possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer might have taken that might have shaken his belief in the existence of probable cause. Certainly in hindsight one wishes this arrest had not occurred, but with hindsight it becomes far easier to portray any person charged with making a close discretionary decision in a pejorative light. In Clipper, this court cautioned that a police officer's failure to pursue potentially exculpatory evidence was not in itself sufficient to negate probable cause. Id. at 20. Nor have other circuits held that a reasonable officer must exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established. See, e.g., Krause v. Bennett, 887 F.2d 362, 371 (2d Cir.1989) ("[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful.").
 
 III.
 
 29
 Appellants' remaining claims merit little discussion. We fail to discern in this single incident any constitutional violation for which Guilford County could be held responsible, and we affirm the district court's dismissal of the claim against it. The district court also properly exercised its discretion in declining jurisdiction over the pendent state law claims. See Carnegie-Mellon University v. Cohill, 484 U.S. 343, 349-50, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Indeed, it has been repeatedly emphasized that what are essentially state false arrest and imprisonment claims are not to be entertained in federal court under § 1983. See, e.g., Edwards v. Baer, 863 F.2d 606, 607 (8th Cir.1988).
 
 IV.
 
 30
 We do not minimize the misfortune that occurred here--misfortune that undoubtedly occasioned disruption and distress in the lives of these plaintiffs. We regret that the Torchinskys were arrested for a crime they did not commit, but not every unfortunate incident gives rise to § 1983 liability against a municipality or its officials. The police must be held to standards of reasonableness, not to standards of perfection. A society that expects police officers to provide protection must afford them in turn some protection from lawsuits. If immunity is lost in every case of mistaken arrest, then many a perpetrator of violent crime will go unapprehended.
 
 
 31
 Here the police officer investigated the crime scene, interviewed acquaintances of the victim, interviewed and reinterviewed the victim, and acted upon the victim's specific identification of his assailants--an identification consistent with the facts of the case as a reasonable officer might perceive them. The officer also requested the advice and judgment of his supervisor, sought and obtained arrest warrants from a neutral magistrate--warrants which a federal district judge subsequently determined satisfied probable cause. We hold that these actions satisfy the requirements of objective reasonableness on which qualified immunity rests. In so deciding, we affirm the judgment of the district court.
 
 
 32
 AFFIRMED.
 
 
 
 *
 Appellants apparently deny that Siwinski obtained a complete statement from Bull before turning on the tape recorder because they rely solely on a transcript of the tape recording when addressing issues related to Bull's identification of them. However, if appellants truly doubted Siwinski's account they could have obtained a statement from the nurse who was in a position to confirm or dispute it. Instead, the Torchinskys offer no evidence to rebut Deputy Siwinski's sworn testimony on how the interview occurred. Therefore, no genuine issue of material fact exists on this point and we credit Siwinski's account of the interview