35 F.3d 556
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Walter ROUSE, III, Plaintiff-Appellant,
v.
W.E. SMITH, a/k/a Billy Smith, individually and in his
official capacity as Sheriff of Lenoir County; Andy Bryan,
individually and in his official capacity as detective with
the Lenoir County Sheriff's Office; Mike Hatcher,
individually and in his official capacity as a Deputy
Sheriff with the Lenoir County Sheriff's Office; Al
Phillips, individually and in his official capacity as
Detective Lieutenant with the Lenoir County Sheriff's
Office; Lenoir County; Board of County Commissioners of
Lenoir County; Faye Thompson Wilkins, Defendants-Appellees,
and Sue Russell, a/k/a Dee Russell; Roy Bowling, Defendants.
 No. 93-7016.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1994.
Decided Sept. 12, 1994.
 
 1
 Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. James C. Fox, Chief District Judge. (CA-92-33).
 
 
 2
 Argued: Reagan hale Weaver, Capitol District Law offices, Raleigh, North Carolina, for appellant.
 
 
 3
 Ursula Marie Henninger, Womble, Carlyle, Sandridge & Rice, Winston-Salem, North Carolina, for appellees.
 
 
 4
 On Brief: Allan R. Gitter, Womble, Carlyle, Sandridge & Rice, Winston-Salem, North Carolina, for appellees.
 
 
 5
 E.D.N.C.
 
 
 6
 AFFIRMED.
 
 
 7
 Before ERVIN, Chief Judge, MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 OPINION
 PER CURIAM
 
 8
 Walter Rouse filed this action against W.E. Smith and others alleging violation of his Fourth and Fourteenth Amendment rights due to unlawful seizure without probable cause. The complaint also included a series of supplemental claims alleging state law violations. The district court dismissed the Sec. 1983 claim on summary judgment, resolved all the state-law claims for which summary judgment had been sought in favor of the defendants, and exercised its discretion not to retain jurisdiction over the remaining state-law claims for which no motion for summary judgment had been filed. Rouse now appeals, limiting his appeal solely to the Sec. 1983 claim. We affirm.
 
 I.
 
 9
 On either Wednesday, March 13 or Thursday, March 14, 1991, Detective Andy Bryan, Jr. of the Lenoir County Sheriff's Department received a telephone call, apparently from Reverend Bowling, a member of the local clergy, indicating that he had information that a child named Kent Croom had been sexually abused. Bryan advised the caller to report the abuse to the Lenoir County Department of Social Services.
 
 
 10
 On Friday, March 15, 1991, Bryan received a telephone call from Dr. Joan Perry, a pediatrician at the Kinston Children's Clinic, who informed him that a 9 year old male named Kent Croom was at the clinic and had told her that he had been sexually assaulted by an adult. Bryan went to the clinic and waited for Dr. Perry, who was examining Croom at the time. Dr. Perry informed Bryan that Croom claimed that he had participated in anal intercourse and possibly oral sex with several men, and that there might be more than one child involved.
 
 
 11
 Bryan then entered the examining room, where he found Croom, his mother, who is deaf, and Dee Russell, who acted as the mother's interpreter and was also the informal guardian of Croom. Croom had been having difficulty in school, and he was staying with Russell, who was tutoring him; Russell was the individual who first learned from Croom his allegations of abuse. Upon learning this, Bryan asked Russell what Croom had told her. She stated that Croom told her a man named "Wally" had been molesting him and other children in the trailer park in which Croom lived. Another man named Jeffrey Wilkins was also involved, as was an older man named "Jake." Russell further stated that Croom had told her the names of some of the other children involved as well, whose names she related to Bryan. Croom's mother, through Russell, indicated that Wally could be Walter Rouse, a resident of the trailer park in which they lived.
 
 
 12
 Bryan then spoke with Croom himself. Croom stated to Bryan that he had been assaulted by Wally and Jeff, and that "they had put their private parts into his private parts." Russell then told Bryan that one of the alleged victims was in the Falcon Children's Home near Fayetteville, because he had been sexually abused. After obtaining agreements from Russell, Croom, and his mother to continue the interview the next day, Saturday, Bryan then left to allow Dr. Perry to complete her examination.
 
 
 13
 Later that day, Bryan contacted the Falcon Children's Home in an attempt to gather more information regarding the alleged victim who was placed there. Although the supervisor now denies giving any information to Bryan, Bryan recounted in his notes that the supervisor confirmed that the child in question had been sexually abused and had been taken from his parents' home by the Department of Social Services (DSS) and placed in the Falcon Children's Home. The supervisor then stated that Bryan would need permission from the DSS to obtain more information. Bryan indicates that he contacted DSS for permission, but they told him that he would need a court order to obtain further information.
 
 
 14
 That Friday evening, Dr. Perry called Bryan at home. She stated that her physical examination was unable to determine whether Croom had been sexually assaulted, but that because Croom indicated that the last incident had occurred six weeks ago, any abrasion could have healed. Dr. Perry further stated that, in her professional opinion, Croom exhibited all of the social and emotional signs of someone who had been sexually assaulted in some way. She also indicated that she could not see him making up a story like the one he had told her.
 
 
 15
 The next morning, Saturday, March 16, 1991, Croom, his parents, and Russell appeared at the sheriff's department. Bryan discussed with Croom the importance of telling the truth, and how people could be hurt by lies. Croom assured him that he was telling the truth and continued his story from the preceding day.
 
 
 16
 Croom stated that the sexual assaults began in November of 1990. He and another boy were playing hide and seek, and that he went to hide by Wally's trailer and that Wally saw him. Wally, he said, got him to go into the trailer's bedroom, where he made him take his clothes off, and that Wally then took his own clothes off. Croom stated that Wally put his front private parts into Croom's back private parts, and that it had hurt. He then stated that Jeff had also done the same thing to him on another occasion, and that Wally and Jeff had done it to some other children that lived in the neighborhood. He stated that Wally and Jeff would pick the children up in the neighborhood and take them to a store and buy them drinks and candy, and then take them back to the trailer and have sex with them. Croom also said that there was another man there sometimes, named Jake, who lived with Wally, but that all Jake did was watch. Further, an additional person, an older man, was occasionally there, but that Croom did not know his identity or name.
 
 
 17
 Bryan then took Croom in his patrol car and asked him to point out the trailer in which the assaults took place. Croom directed him to a particular trailer, saying that was where Jake and Wally lived and the assaults had taken place. Croom also pointed out the houses of other alleged victims, and they returned to the station.
 
 
 18
 Bryan then spoke again with Russell, who repeated the story she had given the day before. She also related that Croom's mother had told her that she had discovered blood in Croom's underwear in the past, and that she had asked Croom about it but that he refused to say anything. Croom, his parents, and Russell then left the police station, and Bryan returned to the trailer park to copy the license plates off of the vehicles in the yard of the trailer Croom had indicated. One of the vehicles was registered to Walter Rouse.
 
 
 19
 On Monday, March 18, 1991,[1] based on the above information, Bryan appeared before a magistrate and obtained arrest warrants for Walter Rouse and Jeffrey Wilkins, charging them with First Degree Sexual Offense involving Croom only, in violation of N.C. Gen.Stat. Sec. 14-27.4 (1986). Rouse was arrested later that same day at his workplace. He denied the charge against him, insisting that he was being set up. Rouse was placed in the Lenoir County Jail on a $10,000 bond. Wilkins turned himself in later that afternoon. He denied know ing Rouse, and denied the allegations. According to Bryan, during the questioning of Wilkins, he and his supervisor, Detective Lieutenant Albert Phillips began to have doubts about the charge, and they decided not to arrest Wilkins and to re-interview Croom the next day.
 
 
 20
 On Tuesday, March 19, 1991, Phillips and Bryan re-interviewed Croom. Croom related again an extensive story about Jeff's and Wally's abuse of him and his friend Timmy. Eventually, Bryan asked Croom if a polygraph would show him to be lying or telling the truth. After it was explained to Croom how a polygraph worked, Croom broke down, started crying, and admitted that he and Timmy had made up the entire story. They had done this because Walter had made them leave his yard and they were mad at Walter and Jeff.
 
 
 21
 That same day, Bryan related this information to the district attorney, who dismissed the charges against Wilkins and Rouse.
 
 
 22
 Rouse subsequently brought this suit, charging false arrest under 42 U.S.C. Sec. 1983 and a series of state law claims, against a number of individuals as well as Lenoir County and the Commissioners of Lenoir County. Lenoir County and the Commissioners of Lenoir County were dismissed from the matter under Rule 41(a) of the Federal Rules of Civil Procedure. The district judge granted summary judgment to the remaining defendants as to the Sec. 1983 claim based upon probable cause to arrest.
 
 II.
 
 23
 This case presents a straightforward question regarding the propriety of an arrest and the immunity of a police officer if the arrest was wrongful. The first inquiry in a Sec. 1983 case is whether the plaintiff has been deprived of a right secured by the Constitution or laws of the United States, for such a violation is a predicate for liability. Baker v. McCollan, 443 U.S. 137, 140 (1979).
 
 
 24
 There can be no doubt that Rouse presents the picture of a highly sympathetic plaintiff: as a man falsely accused of engaging in child sex abuse, he was arrested and had his name and reputation ruined based on the accusations against him of a child whose act of revenge to sate petty anger swept like a tidal wave through Rouse's life. In a time in which child molestation has become a recognized evil against which great energy is properly devoted, the false charge can probably never be cleansed from the memory of the accused or of the community.
 
 
 25
 Nevertheless, the suit Rouse brings is against the officials of his community, and not against the false accuser, and he charges them in the first instance with the violation of his constitutional rights by arresting him unlawfully. An arrest of an innocent person does not, of itself, violate the Constitution, for "the Constitution does not guarantee that only the guilty will be arrested." Id. at 145; Thompson v. Prince William County, 753 F.2d 363, 364 (4th Cir.1985) ("Not every mix-up in the issuance of an arrest warrant, even though it leads to the arrest of the wrong person ... automatically constitutes a constitutional violation for which a remedy may be sought under 42 U.S.C. Sec. 1983."). The Constitution does not require that the police never err; such a rule would hinder officers from performing their function in providing security and safety to the public.
 
 
 26
 Instead, the Constitution requires that an arrest be made with probable cause. An arrest without probable cause violates the Constitution, and properly forms the basis for a Sec. 1983 claim; conversely, the existence of probable cause is an absolute bar to a section 1983 action for false arrest, since there is no "constitutional injury" to the individual in such an instance. Marx v. Gumbinner, 905 F.2d 1503, 1505-06 (11th Cir.1990).
 
 
 27
 The statute on which Rouse's arrest was based states in pertinent part:
 
 
 28
 (a) A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:
 
 
 29
 (1) With a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the victim. N.C. Gen.Stat. Sec. 14-27.4 (1986). The three elements essential to proof of such a charge are that (1)the defendant engaged in a "sexual act,"[2] (2)the victim was at the time of the act twelve years old or less, and (3)the defendant was at least twelve years old and four or more years older than the victim. State v. Griffin, 355 S.E.2d 474 (N.C.1987). We must determine, as did the magistrate and the district court, whether there existed probable cause to arrest Rouse on the charged violation.
 
 
 30
 Probable cause "is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).
 
 
 31
 Probable cause exists where the facts and circumstances within the officers' knowledge, of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.
 
 
 32
 Brinegar v. United States, 338 U.S. 160 (1949) (quotations and citations omitted); cf. Gates, 462 U.S. at 238-39 (When faced with the question of determining probable cause, the task of the magistrate is "simply to make a practical commonsense decision" whether "there is a fair probability" that the person named has committed the offense in question). It must be understood that even the man of reasonable caution whose belief that an offense has been or is being committed is warranted can later turn out to be wrong; that cannot alter the fact that at the time the arrest warrant was issued, the belief was warranted and the arrest was valid. While such situations are not frequent, they do occur and are an unfortunate and inevitable aspect of the law enforcement process.
 
 
 33
 We believe that, based on the totality of the evidence available to him at the time, Bryan had probable cause to arrest Rouse, as unfortunate a mistake as that later turned out to be. In this particular case, five pieces of evidence are the core of the probable cause determination. First, Bryan had the very detailed story of Croom, and knew that Croom's age met the second element of proof under the statute. Bryan also had a fairly detailed description of what Croom alleged had transpired. In the Saturday interview, Croom told Bryan, according to Bryan's notes, that "Wally put his front private parts into his (victim) back private parts." J.A. 75. This clearly satisfied the first element under the statute, that the accused engaged in a sexual act.[3]
 
 
 34
 Second, Bryan had not just his own interview with Croom, but also the input of Dr.Perry. She called Bryan at home on Friday night and told him that, in her professional opinion, Croom had been sexually assaulted, and that she could not see him making up a story like this. As a pediatrician at a children's health facility, her professional opinion on this particular matter was a strong supporting factor. Third, Croom's mother indicated to Bryan, through Russell, that she had discovered blood in Croom's underwear at some previous point. While this information is somewhat vague, it is a contributing factor in the totality of the circumstances test of probable cause.
 
 
 35
 Fourth, Croom guided Bryan to the trailer where he alleged the abuse took place. While this fact does not indicate whether Croom had been abused, it did allow Bryan to check the license plate and determine, if nothing else, that Rouse did indeed live there and that he was 26 years old, which meets the third element under the statute. Finally, Bryan was able to determine that Croom's information that another child had been sexually abused was accurate. While this information did not address whether it was Rouse who was the perpetrator, it did corroborate part of Croom's story.
 
 
 36
 Croom's story, coupled with the pediatrician's declaration of her opinion that he had been abused, and the totality of the circumstances, supports a finding of probable cause. While hindsight brings many doubts, and with the opportunity to reflect the "if only" scenarios proliferate, law enforcement officials often must act based on incomplete information and in situations of considerable pressure. While such errors as this hopefully lead to better action in the future, it is only if the actions in the present violate the law that public officials can be held legally accountable for the harms suffered. Given that the arrest was made lawfully, the claim cannot succeed. Therefore, we affirm the decision of the district court.
 
 AFFIRMED
 
 
 [1]
 Some time over the weekend, someone contacted the media about the alleged abuse. Wilkins and Rouse were specifically identified. Bryan received a telephone call from the local TV station on Monday morning, asking what he was going to do about the possible sex abuse case involving Jeffrey Wilkins and Walter Rouse. The story was reported over local radio and television stations
 
 
 [2]
 The statute defines "sexual act" as:
 cunnilingus, fellatio, anilingus, or anal intercourse, but does not include vaginal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body: provided, that it shall be an affirmative defense that the penetration was for accepted medical purposes.
 N.C. Gen.Stat. Sec. 14-27.1(4).
 
 
 [3]
 "It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker," since "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim." Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir.1991). While the age and demeanor of the accuser certainly must be taken into account in considering the value of the story related, nevertheless the alleged victim's role and story remains a central element in any criminal investigation