**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-2344**

JERRY ANDERSON,

                Plaintiff - Appellee,

        v.

CALDWELL COUNTY SHERIFF'S OFFICE; ALAN C. JONES,
Individually and in his Official Capacity as Sheriff of the
Caldwell County Sheriff's Office; JEFFERY LEE STAFFORD,
Individually and in his Official Capacity as a Deputy
Sheriff of the Caldwell County Sheriff's Office; BRIAN
ANTHONY BENNETT, Individually and in his Official Capacity
as a Deputy Sheriff of the Caldwell County Sheriff's Office;
SHELLY HARTLEY, Individually and in her Official Capacity as
a Deputy Sheriff of the Caldwell County Sheriff's Office;
FIDELITY AND DEPOSIT COMPANY OF MARYLAND; THE OHIO CASUALTY
INSURANCE COMPANY,

                Defendants – Appellants,

        and

JOHN DOE, representing Other Unidentified Officers of the
Caldwell County Sheriff's Office, Individually and in his
Official Capacity as a Deputy Sheriff of the Caldwell County
Sheriff's Office; JANE DOE, representing Other Unidentified
Officers of the Caldwell County Sheriff's Office,
Individually and in her Official Capacity as a Deputy
Sheriff of the Caldwell County Sheriff's Office; DOE BOND
COMPANY; CHRISTOPHER BRACKETT, Individually and in his
Official Capacity as a Deputy Sheriff of the Caldwell County
Sheriff's Office; TRACY PYLE, Individually and in his
Official Capacity as a Deputy Sheriff of the Caldwell County
Sheriff's Office,

                Defendants.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, District Judge. (1:09-cv-00423-MR-DLH)

---

Argued: January 29, 2013          Decided: April 24, 2013

---

Before DAVIS and KEENAN, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Reversed in part, dismissed in part, and remanded by unpublished per curiam opinion.

---

James R. Morgan, Jr., WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellants. Robert Mauldin Elliot, ELLIOT, PISHKO & MORGAN, PA, Winston-Salem, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case comes before the Court on an interlocutory appeal of the district court's denial of a motion for summary judgment on the ground of qualified immunity. The central issue is whether law enforcement officers had probable cause to arrest the plaintiff-appellee for the murder of his wife. The Court finds that probable cause existed for the arrest, entitling the arresting officers to qualified immunity on the plaintiff-appellee's claims under 42 U.S.C. § 1983. Because those claims fail, the plaintiff-appellee's derivative federal claims of supervisory and local government liability also fail. The Court also concludes that public officers' and governmental immunity shield the defendants-appellants from most of the plaintiff-appellee's state law claims, but the Court lacks jurisdiction to review the statutory bond claim.

I.

A.

Jerry Anderson ("Anderson") commenced this action by filing a complaint in which he alleged that the defendants had harmed him in various ways. Specifically, under § 1983 he asserted a claim that various Caldwell County Deputy Sheriffs, led by Captain Jeffery Lee Stafford ("Stafford"), violated his Fourth Amendment rights. He sued the Caldwell County Sheriff's Office ("CCSO") and Sheriff Alan C. Jones ("Jones") for failure to

3

train and supervise the deputy sheriffs. He also asserted state law claims of malicious prosecution, false arrest, and obstruction of justice. Finally, he sued the CCSO's liability insurer and bonding company for any damages caused by the alleged violations of his rights.[1]

The defendants-appellants filed motions for summary judgment on a number of bases, including qualified immunity, public officers' immunity, and governmental immunity. The district court denied those motions, leading to this interlocutory appeal.[2]

B.

In December 2005, the plaintiff-appellee's wife, Emily Anderson ("Emily") went missing from their farm in Caldwell County, North Carolina. Nine days later, Stafford and the CCSO investigative team found her body in the toolbox of her truck, which had been abandoned in South Carolina. After a lengthy investigation, Stafford arrested Anderson for his wife's murder.

---

[1] Anderson sued the sheriff and deputies in both their individual and official capacities. Suits against public officers in their official capacities actually raise claims against the entity for which the officer works. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). We, therefore, will not discuss the official capacity claims against the individual defendants.

[2] The district court did grant summary judgment (1) in favor of Deputy Bennett in his individual capacity for all claims and (2) in favor of all the defendants as to Anderson's negligence claims. These decisions are not relevant to this appeal.

A grand jury indicted him about two weeks later for first-degree murder.  Anderson stood trial for nine weeks in mid-2007, but the jury could not reach a verdict.  The judge declared a mistrial, and ultimately the state dismissed the case without prejudice.

The following facts led to Anderson's arrest and prosecution:

On December 29, 2005, the day Emily disappeared, a worker on Anderson's farm heard Emily and Anderson arguing.  At 9:30 a.m., not long after the argument, Anderson and Emily drove to a wooded area of their farm — Anderson drove a front-end loader and Emily drove her pickup truck.  A neighbor heard the front-end loader driving on Anderson's farm near the wooded area, and then heard two shots.  Another neighbor also heard two shots.  When the police later found Emily's body, it had dirt and grass on it, as well as two gunshot wounds.

One half-hour after driving out to the wooded area, Anderson returned to the farm buildings in the front-end loader.  He told workers on the farm to clean the loader, paying special attention to the bucket.  A worker told the officers that this was an unusual request by Anderson.  Forensic analysis later showed bloodstains on the bucket of the front-end loader.

Sometime between 10 a.m. and noon, Anderson had a worker drive him to the wooded area, where Anderson got out of the

5

vehicle with a large plastic bag. The next day, he told his employees to search the area for a cell phone.

Although none of the farm workers saw Anderson again until the late afternoon, he instructed them to tell anyone who asked that he had been at the farm all day. To bolster this story, he later changed oil filters on some farm equipment, backdated the documentation of the repair to December 29, 2005, and told a worker to lie about the date they had changed the filters.

The CCSO unearthed additional evidence relating to Emily's death, most of it pointing to Anderson as the culprit. In summary, the evidence is as follows:

- Several people indicated that the Andersons were unhappily married, and that Emily planned to leave Anderson.

- Anderson had found cards to Emily from a man named Bill. He also had found indications that someone had sent her flowers.

- When the deputies told Anderson about Emily's death, he showed no emotion and, in fact, laughed and "told stories."

- Not long before Emily's disappearance, Anderson had applied for and received a new passport, listing his sister as his emergency contact.

- Emily had $4.5 million in life insurance with Anderson and their company as beneficiaries. Anderson's first wife, Teresa Martin, told officers that Anderson had her get life insurance designating him as the beneficiary. Martin stated that at some point during the marriage she woke up disorientated in the trunk of the car. Anderson said he planned to hide her away and collect the insurance money, but eventually he let her out of the trunk.

- Bank of America notified the deputies that there had been no activity on Emily's account since December 23, 2005.

- Alltel, the Andersons' phone company, reported that Emily's phone showed no activity after December 28, 2005. The deputies found her phone attached to her belt. The phone company told the CCSO that the phone had been in South Carolina since December 29, 2005.

- An Alltel representative told the CCSO that he believed that Anderson had turned his cell phone off between the hours of 12:04 p.m. and 4:51 p.m. on December 29, 2005. Turning the phone off would avoid cell site registry during that time. In addition, Anderson had Emily's calls forwarded to his phone.

7

- Although he told the deputies he owned no guns, Anderson actually owned several firearms.

- Cadaver dogs had indicated that a corpse had been in the wooded area of Anderson's farm.

Based on the foregoing, Stafford and the deputies developed a theory of the crime. They believed that while in the wooded area on the morning of December 29, 2005, Anderson had fatally shot Emily. He then loaded her body into the toolbox on her truck, and drove her to South Carolina, where he abandoned the truck in a motel parking lot.

Not all the evidence, however, indicated Anderson's guilt. The following evidence surfaced casting some doubt on the deputies' theory:

- Anderson passed a polygraph test at the CCSO's request.

- A Waffle House cook in South Carolina told Stafford that he had received a call on the day they discovered the body. The anonymous caller said that the truck of the "missing woman from North Carolina" was in the parking lot of the Quality Inn located next to the Waffle House. The cook said he believed that the truck had been parked there for two weeks.

- The Waffle House cook said that, during that time, he thought he had seen the driver's side door open and a white male approximately 5'8" to 5'9" with blond hair and a crew cut standing next to the door. The manager was not certain, however, that the individual was standing next to Emily's truck.

- A pathologist and a medical examiner offered opinions that Emily had most likely died one to three days before the discovery of her body on January 7, 2006. They could not rule out, however, that she had died up to ten days earlier.

Finally, the deputies received some information, the significance of which is unclear, because they simply did not follow up on the leads:

- The CCSO did not question people who had registered at the Quality Inn during the time Emily's truck was there.

- The cleaning crew at the motel found some eyeglasses in a room after the police found her body. Emily was missing her eyeglasses when the police discovered her body.

- Two Waffle House employees said they had seen a woman, matching Emily's description, wearing an Old Navy

9

shirt; Emily had been wearing a similar shirt when the police found Emily's body. The woman had entered the Waffle House several times late on the night before the police found her body. This person had been accompanied by a white male.

- Motel employees saw a white male and female pull up beside Emily's truck in the parking lot.

- A man reported to Stafford's secretary that he had seen Emily either on December 28 or 29 at 8:30 a.m. at a convenience store in Caldwell County with a man with dark hair in a mullet haircut (short on the sides, long in the back).

With the foregoing evidence in hand, Stafford appeared before a magistrate, testified under oath, and secured an arrest warrant. The magistrate kept no recording or other record of precisely what Stafford said to obtain the warrant.

## II.

As an initial matter, the Court must determine the propriety and scope of the appeal.

The defendants-appellants appeal the district court's denial of summary judgment on the grounds of qualified immunity, public officers' immunity, and governmental immunity. Ordinarily, courts of appeals will only hear appeals of final orders, Bailey v. Kennedy, 349 F.3d 731, 738 (4th Cir. 2003),

10

and "[d]enials of summary judgment are not final orders," Hensley v. Horne, 297 F.3d 344, 347 (4th Cir. 2002). Certain immunities, however, present an exception to the general rule. Bailey, 349 F.3d at 738–39.

Qualified immunity is not only an immunity from liability, but also immunity from the burdens of facing trial. Brown v. Gilmore, 278 F.3d 362, 366–67 (4th Cir. 2002) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). When a district court denies a motion based on qualified immunity, the defendant can appeal immediately, before a full trial on the merits. Winfield v. Bass, 106 F.3d 525, 528-29 (4th Cir. 1997) (en banc). Otherwise the protection against the burdens of trial is lost, regardless of the outcome of the appeal. Mitchell, 472 U.S. at, 526.

Similarly, "under North Carolina law, public officers' immunity is an immunity from suit." Bailey, 349 F.3d at 738–39 (citing Summey v. Barker, 544 S.E.2d 262, 264 (N.C. Ct. App. 2001)). So, too, is governmental immunity, which "bars action against, inter alia, the state, its counties, and its public officials sued in their official capacity." Arrington v. Martinez, 716 S.E.2d 410, 414 (N.C. Ct. App. 2011).

As in all motions for summary judgment, the existence of a genuine dispute of material issues of fact precludes a district court from granting summary judgment on the basis of immunity.

11

If the factual conflicts form the basis of the denial of summary judgment, an appellate court cannot decide the issues, and it lacks jurisdiction over the case. See Winfield, 106 F.3d at 529. "If, however, resolution of the factual dispute is immaterial to whether immunity should be afforded, the underlying legal question about whether immunity is to be afforded remains and may be appealed . . . ." Jackson v. Long, 102 F.3d 722, 727 (4th Cir. 1996). In the instant case, the district court found that material issues of fact prevented it from awarding summary judgment. Based on this ruling by the trial court, the plaintiff-appellee moves to dismiss the appeal.

The district court did not issue a written opinion. Rather, the court stated its reasoning in a relatively brief oral ruling. It believed that material questions of fact existed as to (1) whether Stafford lied to the magistrate to get the arrest warrant; (2) whether Stafford obtained the arrest warrant by omitting substantial exculpatory evidence; (3) whether Hartley participated with Stafford in getting the warrant; and (4) whether probable cause would exist when the court excised the impermissible elements from Stafford's presentation to the magistrate.

It goes without saying, of course, that parties frequently raise factual disputes when litigating motions for summary judgment. Courts can grant summary judgment to a movant,

12

however, as long as the facts are taken in the light most favorable to the party opposing summary judgment. Scott v. Harris, 550 U.S. 372, 378 (2007); Brown, 278 F.3d at 362 n.2. This rule applies in cases involving immunity, as in any other summary judgment context. Scott, 550 U.S. at 378; Brown, 278 F.3d at 366 n.2. The obligation of the Court, in such cases, is to decide whether, as a matter of law, viewing the facts in the light most favorable to the plaintiff, the defendant should prevail based on immunity. Scott, 550 U.S. at 378. That the parties differ about the facts does not necessarily preclude appellate review. Rather, "this [factual conflict] usually means adopting . . . the plaintiff's version of the facts." Id.

This is precisely the function of the Court in this case. We do not decide disputed facts, but rather questions of law — whether the facts taken in the light most favorable to Anderson establish the defendants-appellants' entitlement to qualified immunity, public officers' immunity, and/or governmental immunity. The Court has jurisdiction to make such a ruling, and we deny the plaintiff-appellee's motion to dismiss the appeal.

## III.

The defendants-appellants argue that the officers in their individual capacities are entitled to qualified immunity on the federal claims. For the reasons set forth herein, we agree.

13

We review de novo a district court's denial of an officer's claim of entitlement to qualified immunity. See, e.g., Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010). Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When ruling on a qualified immunity claim, we must consider two questions: (1) whether a constitutional or statutory right would have been violated on the facts alleged by the plaintiff, and (2) whether the right asserted was clearly established at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 200 (2001).[3]

The district court erred in denying summary judgment to the officers on Anderson's Fourth Amendment claims. Based on our review of the record, we conclude that probable cause existed at the time that Stafford sought the arrest warrant and arrested

---

[3] The Court need not consider these issues in any particular order. Pearson v. Callahan, 555 U.S. 223, 236 (2009). A resolution of either question in the defendants' favor mandates a judgment in favor of the defendants.

Anderson.[4]  Thus, Stafford did not violate Anderson's Fourth Amendment right to be free from an unreasonable seizure. Because no constitutional violation occurred, the Court need not proceed to the second step of the Saucier qualified immunity analysis.

## B.

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable."  Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996) (citing Graham v. Conner, 490 U.S. 386, 396–97 (1989)).  So long as the officer supports the arrest with probable cause, the police have not committed a constitutional violation. See S.P. v. City of Takoma Park, Md., 134 F.3d 260, 274 (4th Cir. 1998).

When a police officer acts pursuant to a warrant, he is entitled to qualified immunity if he could have reasonably believed that probable cause existed to support the application. Porterfield v. Lott, 156 F.3d 563, 570 (4th Cir. 1998) (citing Malley v. Briggs, 475 U.S. 335, 344–45 (1986)).  For probable cause to exist, there need only be sufficient evidence to

---

[4]  Regardless of what Stafford actually said to the magistrate, probable cause still existed for Anderson's arrest. Thus, the alleged uncertainty as to what Stafford told the magistrate does not give rise to a genuine dispute over a material fact.

15

warrant the belief of a reasonable officer that an offense has been or is being committed. Brown v. Gilmore, 278 F.3d at 367. See also Wong Sun v. United States, 371 U.S. 471, 479 (1963). The law does not require that the officer have evidence sufficient to convict the criminal defendant. Brown, 278 F.3d at 367. Once a neutral and detached magistrate deems an arrest reasonable by finding that probable cause exists for the arrest, the continuing seizure of the criminal defendant is also reasonable. Brooks, 85 F.3d at 184; Taylor v. Waters, 81 F.3d at 436.

The Supreme Court defines probable cause as a "commonsense, nontechnical" concept that deals "with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted) (citing Illinois v. Gates, 462 U.S. 213, 231 (1983)). This Court has stated that the probable cause standard does not require that the officer's belief be more likely true than false. United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004) (citing United States v. Jones, 31 F.3d 1304, 1313 (4th Cir. 1994)). Thus, a probable cause determination turns on the assessment of probabilities. Gates, 462 U.S. at 232. "[O]nly the probability, not a prima facie showing, of criminal activity is the standard of probable cause." Id. at 235.

16

A court makes a finding of probable cause based on the totality of the circumstances known to the officer at the time of the arrest. Brown, 278 F.3d at 367. Yet, an officer "may not disregard readily available exculpatory evidence of which he is aware." Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000). "Objective inquiry into the reasonableness of an officer's perception of the critical facts leading to an arrest . . . . must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances." Sevigny v. Dicksey, 846 F.2d 953, 957 n.5 (4th Cir. 1988).

Although an officer may not disregard readily available exculpatory evidence that he knows about, the failure to pursue potentially exculpatory leads will not negate probable cause. Wadkins, 214 F.3d at 541 (citing Torchinsky v. Siwinski, 942 F.2d 257, 264 (4th Cir. 1991)). The law does not require reasonable law enforcement officers to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established." Torchinsky, 942 F.2d at 264 (citing Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989) ("[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful.")).

17

Here, the plaintiff-appellee asks the Court to judge the CCSO investigation through the lens of hindsight. The plaintiff-appellee complains that Stafford relied on a great deal of "questionable" evidence, did not properly evaluate the credibility of witnesses, and clearly did not tell the magistrate about "exculpatory" evidence. But even assuming the plaintiff-appellee is correct in his arguments about the facts, probable cause still existed.

First, as noted above, the failure to follow up on potentially exculpatory leads does not control the ruling in this case. "[T]he failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause." Wadkins, 214 F.3d at 541.

Moreover, the fact that no contemporary record exists to show what Stafford said to the magistrate when seeking the arrest warrant does not undermine the showing in this record of the existence of probable cause. While this practice of providing only oral testimony is of concern to the Court in a general sense, for the purposes of this analysis, the Court need not delve into this issue. Based on a review of the facts available to Stafford, probable cause existed at the time he sought the arrest warrant and arrested Anderson.

Without repeating the evidence in great detail, the undisputed evidence showed that the Andersons had a rocky

18

marriage, that Anderson and Emily had gone into a wooded area on the farm on the morning of December 29, 2005, that the sound of gunshots emanated from the wooded area, that Anderson drove a front-end loader to the wooded area, that forensic analysis showed the presence of blood in the bucket of the front-end loader, that Anderson was not seen most of the day Emily disappeared, and that Anderson had instructed his employees to lie concerning his presence on the day Emily disappeared. In addition, the undisputed evidence showed that Anderson had a large insurance policy on Emily's life, that he had firearms, that it appeared he had turned his phone off for several hours on the day Emily disappeared, and that Emily's phone was in South Carolina starting on the day she disappeared.

Probable cause existed to believe Anderson killed his wife, and the arrest of Anderson therefore did not violate the Fourth Amendment. Moreover, even considering all of the potentially exculpatory evidence cited by Anderson that was known to Stafford, alongside the inculpatory evidence set forth above, there was still probable cause to arrest Anderson. Having concluded that no constitutional violation occurred, we need not proceed to the second step of the Saucier qualified immunity analysis.

C.

Because no Fourth Amendment violation occurred, the sheriff and the CCSO may not be held liable for failure to train or supervise the Caldwell County deputies.[5] No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Giancola v. State of W. Va. Dep't of Pub. Safety, 830 F.2d 547, 550 (4th Cir. 1987). Thus, Anderson's claims of inadequate training or supervision cannot proceed. Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990). Sheriff Jones and the CCSO, therefore, are not liable under § 1983.

IV.

The defendants-appellants argue that the officers in their individual capacities are entitled to public officers' immunity on Anderson's state law claims against them. We review the denial of public officers' immunity de novo. Bailey, 349 F.3d at 739.

---

[5] Since the CCSO does not enjoy qualified immunity, ordinarily we would lack jurisdiction to consider its liability in an interlocutory appeal. But because the CCSO's liability is "inextricably intertwined" with the deputies' liability, the Court will assume pendent jurisdiction over the CCSO's appeal. Altman v. City of High Point, 330 F.3d 194, 207 n.10 (4th Cir. 2003).

20

Under North Carolina law, plaintiffs may hold public officials who are engaged in the exercise of discretionary, governmental duties personally liable only for "corrupt or malicious" actions. Smith v. Hefner, 68 S.E.2d 783, 787 (N.C. 1952); Bailey, 349 F.3d at 742.

Anderson does not argue that the officers undertook their actions in a corrupt manner. Rather, Anderson argues that the officers undertook their actions maliciously. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984). The North Carolina Supreme Court classifies an act as wanton when "done of a wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 890–91.

The Court of Appeals of North Carolina recently held that if probable cause existed for the issuance of an arrest warrant, public officer's immunity shields the defendants from individual liability. Beeson v. Palombo, 727 S.E.2d 343, 346 (N.C. Ct. App. 2012).

Not only did probable cause exist for Anderson's arrest, but Anderson has not put forth evidence that the officers acted with reckless indifference to his rights. Additionally, because probable cause existed, a person of reasonable intelligence

21

would not know that his actions were contrary to his duty. Further, Anderson has not put forth any evidence that the officers intended for their acts to be prejudicial to Anderson.

Thus, public officer's immunity bars the state law claims against the officers in their individual capacities. Accordingly, we hold that the district court erred in failing to enter summary judgment in favor of the officers in their individual capacities on the plaintiff-appellee's various state law claims.

V.

The defendants-appellants argue that the CCSO is entitled to governmental immunity on the state law claims against it. "The existence of sovereign immunity is a question of law that we review de novo." S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 332 (4th Cir. 2008) (internal quotation marks omitted).

Under North Carolina law, "the doctrine of governmental, or sovereign immunity[,] bars action against, inter alia, the state, its counties, and its public officials sued in their official capacity." Arrington, 716 S.E.2d at 414 (N.C. Ct. App. 2011). "Suits against public officials are barred by the doctrine of governmental immunity where the official is performing a governmental function, such as providing police services." Id. (internal quotation marks omitted).

22

Counties and their officials may waive governmental immunity by purchasing insurance. Slade v. Vernon, 429 S.E.2d 744, 746 (N.C. Ct. App. 1993), implied overruling on other grounds recognized in Boyd v. Robeson County, 621 S.E.2d 1 (N.C. Ct. App. 2005). If a county purchases liability insurance, it only waives its governmental immunity by the amount of insurance purchased by the county. Evans v. Housing Auth. of Raleigh, 602 S.E.2d 668, 673 (N.C. 2004). But insurance policies can include explicit exclusions of coverage for any claim that governmental immunity would ordinarily cover.

The insurance policies purchased by the CCSO explicitly exclude coverage for "[a]ny claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina law." See J.A. 731, 734, 782, 794; see also J.A. 862, 1115. Thus, the county's purchase of insurance has not waived governmental immunity as to the state law claims against the CCSO, and these claims fail as a matter of law.

## VI.

The only remaining cause of action is the statutory bond claim against the CCSO's sureties under § 58-76-5 of the North Carolina General Statutes. Section 58-76-5 provides that

> [e]very person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . or other officer, may institute a suit or suits against

23

> said officer . . . and [his] sureties upon [the] respective bonds for the due performance of [his] duties in office in the name of the State . . . and every such officer and the sureties on the officer's official bond shall be liable to the person injured for all acts done by said officer by virtue or under color of that officer's office

Anderson has asserted a claim only against the sheriff's sureties. See J.A. 223–24.

The defendants-appellees argue that "the state tort claim[] against . . . the Sheriff's sureties . . . [is] based solely on respondent [sic] superior" and "cannot be supported" because "the individual officers are entitled to public officer's immunity." Opening Br. 58. But "[b]y expressly providing for th[e] [statutory bond] cause of action, the General Assembly has abrogated common law immunity where a public official causes injury through neglect, misconduct, or misbehavior in the performance of his official duties or under color of his office." Smith v. Jackson County Bd. of Educ., 608 S.E.2d 399, 411-12 (2005) (internal quotation marks omitted). "Immunity is thus immaterial with respect to a claim on a bond under N.C. Gen.Stat. § 58-76-5." Id.; see also Slade, 429 S.E.2d at 747.

Whether Anderson's statutory bond claim fails on other grounds is beyond this Court's jurisdiction.[6] "Our exercise of

---

[6] Although the sureties joined in the notice of appeal filed in this case, they have not filed separate briefs explaining why we have jurisdiction over their appeal. As we explain in the (Continued)

24

pendent appellate jurisdiction is proper only when an issue is (1) inextricably intertwined with the decision of the lower court to deny . . . immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the . . . immunity question." Evans v. Chalmers, 703 F.3d 636, 658 (4th Cir. 2012). "Claims are 'inextricably intertwined' when the resolution of one claim necessarily resolves the other claim." Henry v. Purnell, 501 F.3d 374, 376 (4th Cir. 2007).

Here, our review of the issues of qualified, public officers', and governmental immunity does not require any evaluation of the state statutory bond claim. Accordingly, we decline to exercise pendent appellate jurisdiction over that claim.

## VII.

For the reasons stated above, we dismiss the appeal of the district court's ruling as to the statutory bond claim, and reverse the denial of summary judgment on the remaining claims. The arresting officers are entitled to qualified immunity on the federal claims; the derivative federal claims of supervisory and

---

text, we do not have, and in any event, we decline to exercise, such jurisdiction. The sureties' apparent reliance on Turner v. City of Greenville, 677 S.E.2d 480 (N.C. App. 2009), and Altman v. High Point, 330 F.3d 194 (4th Cir. 2003), is plainly misplaced, as there was no bond claim in either of those cases.

local government liability fail because no actionable claim can exist without a constitutional violation committed by a subordinate employee; public officers' and governmental liability shield the officers and the CCSO from Anderson's state law claims; and the Court lacks jurisdiction to review the statutory bond claim against the sureties.

<u>REVERSED IN PART,</u>
<u>DISMISSED IN PART,</u>
<u>AND REMANDED</u>

26