876 F.2d 17
 George CLIPPER, Plaintiff-Appellee,
v.
TAKOMA PARK, MARYLAND, Defendant-Appellant,
and
National Permanent Federal Savings & Loan Association, a
National Banking Association; Prince George's
County; Grant A. Starkey, Defendants.
 No. 88-1011.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1988.
Decided May 30, 1989.
Rehearing and Rehearing In Banc Denied July 28, 1989.
 
 Douglas B. Schoettinger (Barry Bach, Melanie Stevens, Smith, Somerville & Case, on brief), for defendant-appellant.
 Edward L. Genn (Gilbert J. Genn, Brown, Genn, Brown & Karp, on brief), for plaintiff-appellee.
 Before MURNAGHAN, SPROUSE, and WILKINS, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 The City of Takoma Park, Maryland, appeals the judgment of the district court entered after a jury verdict in favor of George Clipper on his claim under 42 U.S.C. Sec. 1983. The jury awarded Clipper $304,355 on his claim that Takoma Park, through its police officers, had denied him due process of law by arresting him without probable cause and jailing him after he was misidentified as a bank robber. The jury found against Clipper on his 42 U.S.C. sections 1981 and 1985 claims; he does not appeal that verdict.
 
 
 2
 We, of course, view the evidence in a light most favorable to Clipper. McElveen v. County of Prince William, 725 F.2d 954, 958 (4th Cir.), cert. denied, 469 U.S. 819, 105 S.Ct. 88, 83 L.Ed.2d 35 (1984). So viewed, the evidence revealed that at 1:12 p.m. on May 14, 1971, two armed men held up a branch of the National Permanent Federal Savings & Loan in Takoma Park, Maryland. A bank employee set off a silent alarm, and several Takoma Park police officers responded. The first, Officer Henry Wortman, arrived just as the two robbers left the bank to join an accomplice, later identified as Garland Lathan, Clipper's son-in-law, who was waiting with a 1970 Ford Mustang. A gunfight ensued, during which Lathan was shot in the back by one of his accomplices. When the smoke cleared, Wortman captured Lathan and the other young robber, but the oldest one had escaped by commandeering a bystander's car.
 
 
 3
 Other officers of the Takoma Park Police Department, including Lieutenant W.W. Dalrymple, head of the detective bureau, and Captain Robert Porter, acting Chief of Police, as well as FBI agents, were soon on the scene and interviewed bank employees to obtain a description of the escaped robber. Vincent Mohler, the bank manager, gave the police a detailed description including his observation that he was a dark-complexioned black male, approximately fifty-five years old with graying, curly hair. He gave an approximation of the man's height and weight and also stated that he appeared intoxicated. At the request of the Takoma Park Police Department, Mohler gave the film from the bank's surveillance camera to the FBI for developing.
 
 
 4
 The police determined that the 1970 Mustang, captured along with two of the robbers, was registered to George Clipper. FBI agents interviewed Clipper that afternoon, and he informed them that he had been home all day working around his home. At 6:00 p.m. that evening, Corporal Grant Starkey, the junior member of Takoma Park's two-man detective bureau, came on duty and continued the investigation. Later that evening, Clipper came to the station to inquire about the Mustang and was referred to Starkey. Starkey's suspicions were aroused because Clipper roughly matched the description of the escaped robber and because he denied knowing Lathan, whom Starkey knew was Clipper's son-in-law. After talking with Starkey for a while, Clipper explained that he had only met Lathan once and that the car was a gift to his daughter. Starkey contacted Officer Wortman (the only officer who had seen the robber), but Wortman was unable to make a positive identification. Starkey then took several photographs of Clipper. At trial, Clipper testified that he had provided the names of at least two neighbors, including a police officer, who would have verified that he was with them at the time of the robbery.
 
 
 5
 The next day Starkey discussed the case with the involved FBI Special Agent and with his superior, Lieutenant Dalrymple. The FBI agent expressed his opinion that there was probable cause to arrest Clipper. Starkey then took Clipper's--and only Clipper's--photograph to the bank for identification. Mohler and another bank employee identified Clipper, and several other employees told Starkey that he resembled the robber. Starkey next obtained an arrest warrant and, with the cooperation of Montgomery County Police, arrested Clipper on May 15, 1971. Following his arrest, Clipper spent six days in the Prince George's County Jail and was not released until May 21, 1971. Mohler, the bank manager, later stated that Clipper was not the robber, and all charges against Clipper were dismissed in July 1971.
 
 
 6
 Takoma Park, on appeal, argues that Starkey had probable cause to arrest Clipper and stresses that he had no duty to pursue exculpatory evidence. It also contends that there was insufficient evidence of policy or custom or of a causal link between such a custom and Clipper's injury and that certain jury instructions, especially with regard to determining the responsible policymaking officials, were fatally flawed. We find no merit to Takoma Park's argument concerning the jury instructions, and in our view the evidence adequately supports the verdict on the other issues that Takoma Park raises.
 
 
 7
 The authority of a state officer to make an arrest is, of course, to be determined according to state law, consistent with constitutional requirements. United States v. Gearhart, 326 F.2d 412, 414 n. 4 (4th Cir.1964); see also United States v. Lyles, 488 F.2d 290, 292 n. 4 (5th Cir.), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). A section 1983 action, however, is not predicated on the legality or illegality of an act under state law, but on whether that act deprives an individual of "rights, privileges, or immunities secured by the [federal] Constitution and laws." 42 U.S.C. Sec. 1983; see Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1133, 1138 (4th Cir.1982); Street v. Surdyka, 492 F.2d 368, 371-72 (4th Cir.1974). Under the fourth amendment, probable cause for arrest "exists where the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Dunaway v. New York, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979) (citations, quotation marks, and original brackets omitted); see also Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225-26, 13 L.Ed.2d 142 (1964).
 
 
 8
 Viewing the probable cause evidence according to this principle and under the appropriate evidentiary review standard,* we conclude that ample evidence exists to support the verdict. The jury considered evidence that neither Corporal Starkey nor other Takoma Park officers pursued evidence they might have obtained from individuals who would have told them that Clipper could not have robbed the bank because he was at another place at the time of the robbery. Starkey testified that Officer Wortman, the officer on the scene of the robbery, told him that although Clipper looked like the robber, he was not sure that Clipper was the man. Further, prints from the bank surveillance film were available from the FBI by the evening of May 14. It is not clear whether anyone in the Takoma Park Police Department had obtained copies of the bank surveillance photographs prior to Clipper's arrest or while he was incarcerated, and the evidence relating to that factual issue is conflicting. Clipper contends, however, that, if viewed, the photographs would have conclusively established that he was not the missing robber. The photographs were introduced at trial, and again we must view that evidence in a light favorable to Clipper.
 
 
 9
 We would not suggest that Starkey's failure to investigate the leads that Clipper provided was, in itself, sufficient to negate probable cause. In our view, however, the evidence of that omission, see BeVier v. Hucal, 806 F.2d 123, 127-28 (7th Cir.1986), cited with approval in Sevigny v. Dicksey, 846 F.2d 953, 957 n. 5 (4th Cir.1988), the evidence of Wortman's statement to Starkey, and the speculative nature of the other information and investigative instincts upon which Starkey relied in making the arrest form a sufficient evidentiary base to sustain the verdict upon post-trial motions and on appeal.
 
 
 10
 Similarly, sufficient evidence exists from which the jury reasonably could have concluded that Clipper's arrest was made pursuant to a policy or a custom of Takoma Park, and the jury was properly instructed on the law governing its consideration of that issue. Starkey testified that the pre-arrest events were coordinated and known by Lieutenant Dalrymple, his supervisor who was also the head of the detective bureau and the department's training coordinator. Starkey stated that he had received no training materials giving typical examples of arrests properly based on probable cause and that he applied the practices and policies in Clipper's case that were "applied ... to every case that I worked on." At trial, he also related his experience and explained his reasons for arresting Clipper. In deposition evidence introduced at trial in response to the question, "Whatever you did at that particular time, you felt you were doing pursuant to instructions given you by the Takoma Park Police Department?", he responded, "I felt I was doing what I thought was right, and what I learned in school."
 
 
 11
 In Wellington v. Daniels, 717 F.2d 932 (4th Cir.1983), we declined to adopt the gross negligence standard employed by some appellate courts for judging municipal liability and held:
 
 
 12
 It is true that an official policy can be inferred from a municipality's omissions as well as from its acts. Nevertheless, such omissions [such as failure to train or to supervise] are actionable only if they constitute "tacit authorization" of or "deliberate indifference" to constitutional injuries.
 
 
 13
 Id. at 935-36 (citations omitted). In Spell v. McDaniel, 824 F.2d 1380 (1987), decided after the trial of the case sub judice, we reiterated our Wellington holding in a case specifically involving police training, stating:
 
 
 14
 Only those deficiencies in police training policies that result from policymaker fault of at least the degree of deliberate indifference to or reckless disregard to the constitutional rights of persons within police force jurisdiction can give rise to municipal liability.
 
 
 15
 Id. at 1390. In a recent decision, City of Canton v. Harris, 489 U.S. ----, ----, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412, 426 (1989), the Supreme Court adopted the "deliberate indifference" standard for determining when a municipality may be held liable in "failure to train" cases.
 
 
 16
 The district court in the case we now consider carefully instructed the jury that:
 
 
 17
 The city cannot be held liable for the wrongful acts of its employees merely by reason of the employer[-]employee relationship. Liability of the city can only be imposed upon the basis of the city's own policy, practices or customs. Such a policy, practice or custom may arise in either of 2 ways.
 
 
 18
 One, by an affirmative policy of unconstitutional conduct promulgated by policy making officials of the city:
 
 
 19
 Or, 2, by acts or omissions of the city through its highest authorized officials which constitutes either a tacit authorization of or a deliberate indifference to constitutional injuries.
 
 
 20
 The district court repeated its recognition of and application of the Wellington standard in rejecting Takoma Park's motion for judgment n.o.v.:
 
 
 21
 Under all of the circumstances of this case, including, particularly, the unique circumstances of the small size of the police force involved here and the reasonable inferences to be drawn by the jury from the facts as presented, the principles established ... in Wellington v. Daniels, 717 F.2d 932 (4th Cir.1983), do not mandate setting aside the verdict in this case.
 
 
 22
 In our view, the Supreme Court's opinion in City of Canton does not require a change in the standard of review we adopted in Wellington and Spell, and the district court appropriately instructed the jury on the close factual issue using that standard. We perceive no reason to disturb the jury's verdict.
 
 
 23
 In view of the above, the judgment of the district court is affirmed.
 
 
 24
 AFFIRMED.
 
 
 
 *
 "Fact-finding by a jury will be set aside only where the evidence, viewed in the light most favorable to the parties supporting the jury's verdict, is so clear that reasonable persons could reach no other conclusion than that asserted on appeal." McElveen, 725 F.2d at 958