# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joyce Combs                  :

                                  :

                                  :

                                  :

          v.                       : No. 1561 C.D. 2013

                                    : Argued: May 12, 2014

Det. Linda Blowes, Badge No. 9107,  :

                                  :

               Appellant         :


BEFORE:   HONORABLE BERNARD L. McGINLEY, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED


**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                 **FILED:  February 17, 2015**


This is an appeal from an August 1, 2013 order of the Philadelphia County Court of Common Pleas (Trial Court) denying the motion of Detective Linda Blowes (Appellant) for judgment notwithstanding the jury's verdict finding her liable for civil damages for malicious prosecution of Joyce Combs (Ms. Combs) and concluding that Appellant was not immune under the Tort Claims Act[1]

---

[1] The act for which the "Political Subdivision Tort Claims Act" is the formal title has been repealed. Act of November 26, 1978, P.L. 1399, *as amended, formerly* 53 P.S. §§ 5311.101-5311.803, repealed by the Act of October 5, 1980, P.L. 693. However, the "Tort Claims Act," has remained as the "unofficial" title for the successor provisions in the Judicial Code, 42 Pa. C.S. §§ 8541-8564. The Tort Claims Act shall not shield a local agency employee if it is judicially determined that the act of the employee caused an injury and that such act constituted willful misconduct. 42 Pa. C.S. § 8550.

because her conduct amounted to willful misconduct. For the reasons that follow, we affirm the order of the Trial Court.

Appellant filed an affidavit in support of probable cause and obtained a warrant for the arrest of Ms. Combs on kidnapping and related charges for the alleged abduction of Ms. Combs' four-month old twin granddaughters. All charges were subsequently dropped and Ms. Combs commenced a civil action against Appellant for malicious prosecution. The jury returned a verdict in Ms. Combs' favor, awarding Ms. Combs one hundred fifty thousand dollars ($150,000.00) in compensatory damages and one thousand dollars ($1,000.00) in punitive damages. Appellant filed a motion for judgment notwithstanding the verdict, which the Trial Court denied. Appellant appealed to this Court. The Trial Court issued a 1925(a) opinion in November 2013 in support of its denial of Appellant's Motion for Post-Trial Relief, in which the Trial Court concluded that the jury could reasonably have found that Appellant's testimony was not credible, that Appellant lacked probable cause to arrest Ms. Combs, that Appellant had recklessly disregarded Ms. Combs' rights, and that Appellant was liable for malicious prosecution.

Before this Court, Appellant argues that she relied upon the credible statement of a single witness, which was sufficient to establish the probable cause necessary to arrest Ms. Combs. Appellant argues that she had no duty to continue to investigate or to disprove a complainant that appeared credible and that the Trial Court erred by equating a negligent or inadequate investigation with a lack of probable cause. Appellant further argues that even if she lacked probable cause to arrest Ms. Combs she is immune under the Tort Claims Act because a reasonable

jury could not conclude that she knew she was disregarding Ms. Combs' rights and acted despite that knowledge.

Ms. Combs argues that the evidence supports the jury's verdict. Ms. Combs contends that Appellant made knowing misrepresentations in obtaining the arrest warrant, fabricated documents and information in order to make it appear to her supervisors as though she was conducting an investigation, failed to follow basic police directives, and disregarded exculpatory evidence. Ms. Combs also argues that the evidence was more than sufficient to satisfy the heightened standard necessary to overcome Tort Claims Act immunity and that the jury did not err in concluding that Appellant's conduct was willful and outrageous rather than merely negligent.

Overturning a jury's verdict is an extreme remedy that should not be done casually. *Burkholz v. Department of Transportation*, 667 A.2d 513, 516 (Pa. Cmwlth. 1995). Judgment notwithstanding the verdict is appropriate where a movant is entitled to judgment as a matter of law, and where the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered in favor of the movant. *Rohm and Hass Co. v. Continental Casualty Co.*, 781 A.2d 1172, 1176 (Pa. 2001). To grant judgment notwithstanding the verdict because a movant is entitled to judgment as a matter of law, we must review the record and conclude that "even with all the factual inferences decided adverse to the movant the law nonetheless requires a verdict" in her favor. *Id.* (internal citations omitted). To grant judgment notwithstanding the verdict because no two reasonable minds could disagree that the verdict should have been entered in favor of the movant, our review of the evidence must lead inextricably to the conclusion that a verdict for the movant was beyond peradventure. *Id.*

3

In each instance, the evidence must be considered in the light most favorable to the verdict winner, the verdict winner must be given every reasonable inference of fact arising from the evidence, and any conflicts in the evidence must be resolved in favor of the verdict winner. *Moure v. Raeuchle*, 604 A.2d 1003, 1007 (Pa. 1992). Judgment notwithstanding the verdict must only be entered in a clear case that is free from doubt. *Id*. Appellate review of the evidence may not be based on how the court would have voted if it had been the jury, but "on the facts as they come through the sieve of the jury's deliberations." *Brown v. Shirks Motor Express*, 143 A.2d 374 (Pa. 1958). It is axiomatic that "in our system of justice, the jury is sacrosanct and its importance is unquestioned." *Boscia v. Massaro*, 529 A.2d 504 (Pa. Super. 1987). Our review must be mindful that the "members of the jury see and hear witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review." *Id*. However, despite our trust in the jury, its wisdom cannot go unchecked, and where our review demands it, we will reverse a verdict that runs contrary to the evidence and the law.

Malicious prosecution is a tort disfavored by the courts; the law favors encouraging proceedings where there is a good faith belief that an accused may be guilty and allowing the criminal justice system to stand as the final arbiter of the question. *Miller v. Pennsylvania Railroad Co.*, 89 A.2d 809, 810 (Pa. 1952); *Corrigan v. Central Tax Bureau of Pennsylvania, Inc.,* 828 A.2d 502, 506 (Pa. Cmwlth. 2003). For this reason, the plaintiff bears a heavy burden when bringing a claim for malicious prosecution and must demonstrate: (i) that the defendant

4

initiated the prosecution without probable cause; (ii) with malice; and (iii) that the proceedings terminated in the plaintiff's favor. *Simpson v. Montgomery Ward & Co.*, 46 A.2d 674, 678-679 (Pa. 1946); *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Cmwlth. 2010); *La Frankie v. Miklich*, 618 A.2d 1145, 1148 (Pa. Cmwlth. 1992).

Probable cause does not require an actual showing of criminal activity; rather, probable cause requires only a substantial chance of criminal activity or "a reasonable ground of suspicion supported by circumstances sufficient to warrant that an ordinary prudent person in the same situation could believe a party is guilty of the offense charged." *Turano v. Hunt*, 631 A.2d 822, 825 (Pa. Cmwlth. 1993); *see also Illinois v. Gates*, 462 U.S. 213, 233 & 244 n.13 (1983); *Renk v. City of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994); *Commonwealth v. Gray*, 503 A.2d 921, 926 (Pa. 1985) (adopting the "totality of the circumstances" standard used in *Illinois v. Gates* for determining the validity of a warrant).[2] The existence of probable cause is a complete defense to a claim of malicious prosecution. *Turano*, 631 A.2d at 824; *La Frankie*, 618 A.2d at 1148. The want of probable cause is traditionally a question for the court; however, where facts material to the issue of probable cause are in controversy, the question is for the jury to resolve. *Kelley v. General Teamsters, Chauffeurs and Helpers, Local Union 249*, 544 A.2d 940 at 941 (Pa. 1988); *Miller*, 89 A.2d at 809; *Turano*, 631

---

[2] Philadelphia Police Department Directive No. 139, Section II. Definitions, A. "Probable Cause – The existence of facts and circumstances that would justify a person of reasonable caution to believe [i] that an offense has been or is being committed; [ii] that the particular person or item to be seized is reasonably connected to the crime; and [iii] that the person can be found at a particular place or the item can be found in the possession of a particular person or at a particular place." (Plaintiff's Exhibit (P Ex.) 41, Directive 139, Reproduced Record (R.R.) at 496a.)

A.2d at 825; *Wainauskis v. Howard Johnson Co.,* 488 A.2d 1117, 1122 (Pa. Super. 1985).

In order to demonstrate malice, a plaintiff must demonstrate that "the primary purpose for which the proceedings were initiated was not to bring an offender to justice." *Neczypor v. Jacobs*, 169 A.2d 528, 531 (Pa. 1961) (*quoting Simpson*, 46 A.2d at 678). "Legal malice is not limited to motives of hatred or ill will, but may consist of defendant's reckless and oppressive disregard of plaintiff's rights." *Hugee v. Pennsylvania R. Co.*, 101 A.2d 740, 743 (Pa. 1954). The existence of malice is always a question for the jury and "may be inferred from the absence of probable cause." *Kelley*, 544 A.2d at 941; *Hugee*, 101 A.2d at 743.

This case presents two issues for our review: the first is whether Appellant lacked probable cause for the warrant she sought for Ms. Combs' arrest; and the second issue is whether Appellant is immune from liability under the Tort Claims Act.

The circumstances giving rise to the instant matter began on April 14, 2008, when Danielle Morales (Ms. Morales)[3] and Lamar Beamer (Mr. Beamer)[4] reported to Philadelphia Police Department Officers Lee and Harper that their four-month old twin daughters, Imani and Izhane Beamer, were taken without permission by Ms. Morales' mother, Ms. Combs. (Plaintiff's Exhibits (P Ex.) 2 and 3, Initial Police Reports, Reproduced Record (R.R.) at 355a, 357a.) The police

---

[3] Danielle Morales has a number of aliases and during the course of the jury trial different witnesses referred to her by different names. (Beamer Video Deposition, February 22, 2012 (Beamer Dep.) at 18, R.R. at 281a; Jury Trial Transcript August 27, 2012 (N.T. 8/27/12) at 75; Jury Trial Transcript August 29, 2012 (N.T. 8/29/12) at 63.) For consistency, "Ms. Morales" will be used to refer to the person known as Danielle Morales.

[4] Since the events that are at issue here, Lamar Beamer has adopted the name Shakyil Berry. (Beamer Dep. at 8, R.R. at 271a.) For consistency, Shakyil Berry will be referred to as "Mr. Beamer."

reports described both Imani and Izhane as female, 6 pounds 3 ounces, and 21 inches long. (*Id.*) Imani was reported as having a mole on her right foot between her toes and a doughnut-shaped birthmark on her right inner thigh; Izhane was reported as having a mole on her left foot between her toes and a doughnut-shaped birthmark on her right inner thigh. (*Id.*) The reports state that the twin babies were born at Crozer-Chester Medical Center on February 10, 2008, and that there was no custody dispute with Ms. Combs. (*Id.*) The reports state that both parents reported that the twins were "last seen with grandmother who stated that she was taking [them] to Delaware." (*Id.*) Ms. Combs was identified in the reports as "Joyce Marable" with an address of 5960 L-w Street and a Philadelphia area telephone number ending with the digits "1948." (*Id.*) Ms. Morales' sister was identified in the reports as Kimberly Marable with an address of 1728 L-d Street and her telephone number was given. (*Id.*) Ms. Morales and Mr. Beamer were both identified as living at the same address, 1735 D-e Street, and as having the same telephone number. (*Id.*)

On April 14, 2008, Appellant began investigating the reported kidnapping of the missing twins. (Jury Trial Transcript August 27, 2012 (N.T. 8/27/12) at 80; Jury Trial Transcript August 28, 2012 (N.T. 8/28/12) at 145-148.[5]) On April 16, 2008 Appellant drafted an affidavit of probable cause for "Joyce Marable." (N.T. 8/28/12 at 169.) Following review of Appellant's draft affidavit, the District Attorney's charging office approved charges against "Joyce Marable" for two (2) counts of Criminal Conspiracy, Unlawful Restraint, Interference- Child, False Imprisonment, Concealing Whereabouts, Endangering Welfare, and

---

[5] The reproduced record provided by the Appellant does not contain complete transcripts of the jury trial. Complete transcripts were received by this Court on September 9, 2014. All references to the trial testimony are to the transcripts received by this Court on September 9, 2014; transcript references do not refer to the reproduced record.

Recklessly Endangering Another Person. (P Ex. 6, Affidavit of Probable Cause, R.R. at 361a; N.T. 8/28/12 at 171, 177.) Appellant filed the following finalized affidavit of probable cause for the approved charges:

On Monday 4/14/08 at about 7:00PM, parents of the complainants (missing 2 month old infant girls- twins) were reported missing: Imani Beamer and Izhane Beamer dobs: 2/10/08 b/f. The girls were reported by both parents; both stated there is no custody dispute with the maternal grandmother, identified as defendant #1: Joyce Marable 62/b/f. When interviewed by Det Blowes #9107, at their residence ([D-e] St.) at about 8:54PM on 4/15/08, the parents stated their baby girls were left in the custody of her sister (Kimberly Marable 45/b/f) at her residence at [L-d] St, on Tuesday, 4/8/08. The parents were to pick the girls up on the next day, Wednesday, 4/9/08. However, because of a sudden appointment, the sister asked if the maternal grandmother, listed defendant, could watch the girls briefly. The parents stated they agreed she has watched the girls prior to this and there was no reason for any concern. The girls were then taken to 5960 [L-w] St, which is the defendant's residence. Sometime, on Wednesday 4/10/08, before the parents could pick up the girls, the defendant packed up all the girls things, including a pack and play crib, and left for an unknown location in Dover, Delaware. The defendant's sister and defendant #2: Aunt Johnnie Mae Walters 58/b/f, informed the parents their father is very ill, and she picked defendant #1 and the girls up in a new silver Envoy with unknown Delaware tags and left. She also stated she would return the girls on Saturday, 4/12/08. The parents stated, they did not give the defendant any permission to take the girls away into another state nor to keep them all this time and they demanded their return. Defendants refused, stating they will return sometime on Saturday, the 12th.

On Saturday, 4/12/08, the maternal grandmother defendant #1 and the aunt defendant #2, failed to bring the girls home. Later the same evening the Aunt called and stated their father had passed away and they would now return the girls on Monday, the 14th. Once again, the defendants failed to return the girls despite several demands by the parents. The parents also stated the defendants have failed to tell them the location of the girls, they now believe are in Wilmington, Delaware.

On Wednesday, 4/16/08, exactly one week later, the defendants still refuse to return the infant girls to their parents. The parents insist there is no custody dispute or issue; all computer checks would indicate no custody dispute or DHS actions involving the missing baby girls. The most recent communication was at about 3:30PM, on 4/16/08. The defendants are now demanding the father of the girls to submit to a drug test before they return their children. The parents believe the defendants have no intention on bringing the girls home and they refuse to give their location.

(P Ex. 6, Affidavit of Probable Cause, R.R. at 361a, 362a; N.T. 8/28/12 at 177-178.)

Ms. Combs was not immediately arrested. Appellant testified that in the fall of 2008, she received a call from an officer on the fugitive task force, "Brian", requesting information on whether the warrant Appellant sought for "Joyce Marable" was still good. (N.T. 8/28/12 at 196, 232.) Appellant testified that she checked the National Crime Information Center (NCIC) database to see if the warrant was still active and checked the Philadelphia Arraignment Reporting System (PARS) database to see if an arrest had been made, and that upon finding an active warrant with no reported arrest she communicated that the warrant was still good. (N.T. 8/28/12 at 238.) On February 29, 2009, Ms. Combs was arrested in front of her colleagues and students at Bache-Martin Elementary School in Philadelphia, where she had worked as a teacher's-aid for severally disabled children for over fifteen years. (Jury Trial Transcript August 29, 2012 (N.T. 8/29/12) at 96-97, 101, 104-105, 124.) Following Ms. Combs' arrest, and several subsequent court appearances, the District Attorney received a letter from Ms. Morales stating that she had fabricated the existence of the children and the allegations against Ms. Combs in order to convince Mr. Beamer to reunite with

9

her. (P Ex. 36, Morales Letter to DA Yacoubian, R.R. at 477a; N.T. 8/28/12 at 134, 136; N.T. 8/29/12 at 130.)

The fact that the twins did not exist and were instead a fabrication is a sensational fact but a fact that is largely irrelevant to this appeal. The main relevance of this fact is that it demonstrates that Ms. Combs indisputably satisfied the third prong of her malicious prosecution claim: the proceedings terminated in her favor. However, the issue of Appellant's liability cannot be resolved by the fact that the twins did not exist and the proceedings terminated in Ms. Combs' favor. A police officer is not a judge or jury; it is not the duty of a police officer to determine guilt or innocence but to determine whether there is a reasonable basis to believe there is criminal activity. *Manley*, 997 A.2d at 1239; *De Salle v. Penn Central Transportation Co.*, 398 A.2d 680, 683-684 (Pa. Super. 1979).

Previous Pennsylvania cases, *Hugee* and *Neczypor*, held that an inadequate and unreasonable investigation of the circumstances concerning alleged criminal conduct cannot support a reasonable ground of suspicion, for as the late Justice Musmanno stated in *Neczypor*, "when no immediate action is called for and time may be devoted to adequate preliminary investigation, the protection of the individual demands such an investigation because the hardships, humiliation, suspense and expense to which an innocent person is subjected in an improper prosecution cannot be compensated for by a mere acquittal." 169 A.2d at 531; *see also Cosmas v. Bloomingdales Brothers*, 660 A.2d 83, 86-87 (Pa. Super. 1995) ("haste or lack of care, however, may be an important issue in the search for probable cause in a malicious prosecution case"). Probable cause does not exist where there is evidence of the unreliability of the witness whose statement is relied upon, where exculpatory evidence is disregarded, and where material facts are

10

withheld or misrepresented; however, a police officer has no duty to investigate exculpatory evidence that is not readily available, speculative information provided by the accused, and the statements of a single credible witness may serve as sufficient evidence of probable cause. *See, e.g., Kelley*; *Hugee*; *Miller*; *Turano*; *Wainauskis*; *De Salle*.[6]

In *Turano*, the plaintiff in a malicious prosecution action argued that a police officer was liable for an inadequate and unreasonable investigation into alleged criminal activity because the police officer issued a summons for the plaintiff's arrest without interviewing him, inspecting his vehicle, which was allegedly used in the crime, and without verifying his alibi.[7] 631 A.2d at 825. Due to the lack of similar cases in Pennsylvania, this Court examined cases from other

---

[6] Although this jurisdiction does not contain extensive precedent examining probable cause in the context of malicious prosecution claims, the law in Pennsylvania concerning a police officer's duty when establishing probable cause is in accord with decisions reached in other jurisdictions. *See, e.g. Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) (while a single credible witness may support probable cause "independent exculpatory evidence or substantial evidence of the witness' own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist."); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."); *Clipper v. Tacoma Park Maryland*, 876 F.2d 17 (4th Cir. 1989) (probable cause negated by failure to investigate readily available exculpatory evidence and reliance on speculative information); *Boose v. City of Rochester*, 71 A.D. 2d 59 (N.Y. App. Div. 1978) (probable cause negated by failure to verify identity of accused, inclusion of inaccurate information, and dormant investigation prior to arrest).

[7] In *Turano* the police officer applied for an arrest warrant for Turano on the basis of a statement from Hunt that "while he was attempting to cross the street, a dark color, older-model station wagon struck him with the left front fender and continued to drive away." 631 A.2d at 824. Hunt further stated that the driver "looked like" Turano, whom Hunt knew, and Hunt later found the car parked on a street in Carbondale. *Id.* The police officer located the vehicle in front of Turano's store and confirmed that the vehicle belonged to Turano. *Id.* After receiving a summons for arrest, Turano contacted the police officer and informed him that he had not hit Hunt and that he had an alibi. *Id.* Turano was never contacted by the police for an interview, to inspect his car, or to verify his alibi. *Id.* Following a preliminary hearing that was twice continued, the charges against Turano were dropped. *Id.*

11

jurisdictions where malicious prosecution claims were brought based on the failure of a police officer to investigate an alleged defendant's alibi. *Id*. at 826. This Court concluded that where probable cause exists due to a witness's credible identification, the failure to investigate evidence that would be beneficial to the accused, such as an alibi, does not vitiate the reasonable basis for prosecution. *Id*.

The *Turano* Court cited with approval *De Salle*, where the Superior Court held that probable cause existed for a railroad flagman's arrest when stolen property was found in an area over which the flagman and a conductor had exclusive control, even though had the police checked for fingerprints, the flagman would have been cleared of wrongdoing. *Turano*, 631 A.2d at 825. In reaching its conclusion in *De Salle*, the Superior Court noted that the arrest was neither precipitous nor deficient in normal investigative procedures. 398 A.2d at 684. In addition to relying on *De Salle*, *Turano* distinguished a second Superior Court decision, *Wainauskis*, because unlike the evidence in *Wainauskis*, the evidence in *Turano* did not demonstrate that material facts were withheld or misrepresented in order to obtain the summons for plaintiff's arrest. *Turano*, 631 A.2d at 825; *see also Commonwealth v. Hall*, 302 A.2d 342, 344 (Pa. 1973) ("if a magistrate is furnished, and reviews falsified averments, he is effectively precluded from making a detached and objective determination," of probable cause) (internal quotations omitted).

In the instant matter, there was sufficient evidence for a reasonable jury to conclude that Appellant's affidavit in support of arrest was based upon material facts withheld or misrepresented, that it disregarded available exculpatory evidence, and that it was supported by statements from a witness known to be unreliable. The evidence therefor supports the jury's determination that Appellant

12

lacked probable cause for the arrest of Ms. Combs and that Appellant prevented a neutral magistrate from making a detached and objective determination as to whether to issue a warrant for Ms. Combs' arrest.

In the affidavit, Appellant states that she interviewed both Ms. Morales and Mr. Beamer at their D-e Street residence on April 15, 2008. (P Ex. 6, R.R. at 361a-362a; N.T. 8/27/12 at 134, 136, 184; N.T. 8/28/12 at 51-52, 160.) Appellant testified before the jury that she did not interview Mr. Beamer but that he was present when she interviewed Ms. Morales. (N.T. 8/27/12 at 184a.) The Investigative Interview Report created by Appellant did not identify Mr. Beamer as being present at the interview and the only statement relayed by Mr. Beamer recorded in the report was a quotation attributed to him by Ms. Morales. (P Ex. 10 Investigative Interview Report, R.R. at 366a-371a; N.T. 8/28/12 at 51.) Mr. Beamer testified that he never met Appellant and that she did not come to his residence. (Beamer Video Deposition, February 22, 2012 (Beamer Dep.) at 26, 67, R.R. at 289a, 330a.) Mr. Beamer testified that his only contact with Appellant was during three phone calls in the month following the initial police report and that he never spoke with her face to face. (*Id*. at 83, 85, 86, R.R. at 346a, 348a, 349a.)

The jury heard evidence that although Mr. Beamer referred to Ms. Morales as his wife, the two were in fact divorced, and that they maintained separate residences, with Ms. Morales residing in Delaware County and Mr. Beamer residing in Philadelphia with his Grandmother Thelma at the D-e Street address. (*Id*. at 16, 18 24, 57, R.R. at 279a, 281a, 287a, 320a.) Although the Investigative Interview Report states that Mr. Beamer's Grandmother Thelma spoke with Ms. Combs by phone after Ms. Combs had taken the children,

Appellant testified that she did not interview Thelma to corroborate this fact while at the house because she was told that Thelma was ill; Appellant did not document the presence or illness of Thelma in the Investigative Interview Report. (N.T. 8/27/12 at 182.)

The Investigative Interview Report states that the interview took place on April 15, 2008 at 8:54 p.m. (P Ex. 10, R.R. at 366a-371a.) However, the jury was presented with evidence that Appellant sent a message to a Delaware State Police terminal at 7:17 p.m. on April 15, 2008 requesting assistance locating "Joyce Marable" who was last seen in a new silver Envoy with Delaware license tags. (P Ex. 28, Delaware Terminal Message, R.R. at 446a-451a.) Appellant testified that she learned of the silver Envoy with Delaware license tags from her interview with Ms. Morales; this information is not in the initial police report and the only documentation of the source of this information is the Investigative Interview Report, which was purportedly created over an hour later in the dining room of Mr. Beamer's residence. (N.T. 8/27/12 at 139, 189, 194-195, 197.)

The Investigative Interview Report was not signed by Ms. Morales and was written in Appellant's hand, and while Appellant testified that she recorded Ms. Morales' words verbatim on the report, Appellant also testified that Ms. Morales made other statements during the interview that supported Ms. Morales' credibility in Appellant's eyes, which she did not record, such as explaining the absence of the twins' effects from the household by stating that the twins' belongings were upstairs and at her sister's house. (P Ex. 10, R.R. at 366a-371a; N.T. 8/27/12 at 157, 211-212.) This testimony conflicts with the affidavit and with the statements by Ms. Morales recorded in the Investigative Interview Report, where Ms. Combs' is said to have taken all of the twins' belongings to

14

Delaware. (P Ex. 10, R.R. at 366a-371a; N.T. 8/27/12 at 211-212; N.T. 8/28/12 at 164.) Appellant testified and the evidence demonstrated that at no other time during the course of Appellant's investigation did she leave the South Detectives Division in order to interview any other witness or otherwise investigate the missing twins. (N.T. 8/27/12, 8/28/12; P Ex. and Defendant's Exhibit (D Ex.) all, R.R. at 352a-638a.)

In her statement to Appellant, Ms. Morales did not identify Ms. Combs' by her correct name, identifying her instead as "Joyce Marable"; Ms. Combs has used the name "Joyce Combs" since her divorce in 1974 and it is both her legal name and the name she is known by. (P Ex. 2, 3, 10, R.R. at 366a-371a; D Ex. 9 PennDot Record, Interstate Identification Index Record, R.R. at 571a-579a; N.T. 8/28/12 at 174-175, 179; N.T. 8/29/12 at 94-95.) Appellant was aware of Ms. Combs' correct name, but Appellant referred to Ms. Combs as "Joyce Marable" in the affidavit. (P Ex. 6, R.R. at 361a; N.T. 8/28/12 at 174-175, 178.) Ms. Morales did not know the correct address for Ms. Combs and reported that she lived in the 5900 block of L-w street, although she also stated that she had been to Ms. Combs' house recently and spoken with a neighbor, Ms. Doral, who told her that Ms. Combs and Ms. Morales' Aunt, Johnnie Mae Walters, had taken the twins away in a silver Envoy with Delaware tags. (P Ex. 10, R.R. at 354a-357a, 366a-371a; N.T. 8/27/12 at 154, 156-158, 160-161, 163; N.T. 8/28/12 at 24, 30.) The affidavit does not mention Ms. Doral. Appellant testified that she had problems locating Ms. Doral, but Appellant also testified that she did not speak with any of Ms. Combs' neighbors in an attempt to locate Ms. Doral or ask other police officers to do so, and Appellant was unable to offer any documentation of a search for Ms. Doral. (N.T. 8/27/12 at 161; 8/28/12 at 24, 30.) For more than twenty-two

15

(22) years, Ms. Doral has lived four (4) doors down from Ms. Combs on the 5600 block of L-w Street. (N.T. 8/29/12 at 96.) The database searches that Appellant conducted did uncover Ms. Combs' correct address, but Appellant did not check the address, determine whether anyone was living at the address, or put the correct address in the affidavit. (D Ex. 9; N.T. 8/28/12 at 61-64, 174, 180, 182-183.) Ms. Combs has lived on the 5600 block of L-w street for over twenty-two (22) years, during which time she has routinely left for work at six o'clock in the morning (6:00 a.m.) and returned home by five-thirty in the evening (5:30 p.m.) Monday through Friday, a routine she followed in April and May of 2008. (N.T. 8/29/12 at 96-100.)

Ms. Morales reported that she had left the twins with her sister, Kimberly Marable, who had then taken the twins to Ms. Combs' residence. (P Ex. 10, R.R. at 366a-371a.) The address provided by Ms. Morales on the initial police report for her sister Kimberly was incorrect and, although Appellant testified that Ms. Morales stated she regularly left the twins with her sister, Ms. Morales was unable to specify an address and could name only the street on which her sister lived. (P Ex. 2, 3, and 10, R.R at 354a-357a, 366a-371a; N.T. 8/27/08 at 153-154, N.T. 8/28/12 at 123-124, 164.) However, on April 14, 2008, Appellant had run both PennDot and Voter Registration checks on Kimberly Marable, which had returned two addresses, one of which matched the street name provided by Ms. Morales. (P Ex. 32, PennDot Record, R.R. at 466a-467a; D Ex. 3 Voter Registration Record, R.R. at 523a-527a.) Appellant testified that she tried very hard to find Kimberly Marable and interview her. (N.T. 8/27/12 at 152.) However, Appellant also testified that she did not check for Kimberly Marable at either of the addresses her searches had returned; she did, however,

16

proceed as though the L-d Street address, which matched the street name provided by Ms. Morales, was the correct address. (N.T. 8/27/12 at 172, 199-201; N.T. 8/28/12 at 22-23, 150, 202-203.) Kimberly Marable testified that between April 2008 and February 2009 she was living at the L-d Street address, where she had been residing for two (2) to three (3) years. (N.T. 8/29/12 at 73.) Kimberly Marable testified that during this period she was unemployed, and that usually either she or her son, who was also living in the residence, was at home. (N.T. 8/29/12 at 74.) Kimberly Marable testified that she did not receive a message in any form from the Philadelphia Police Department asking her to contact Appellant. (N.T. 8/29/12 at 74-75.)

The Investigative Interview Report records Ms. Morales as stating that her Aunt Johnnie Mae called and told Ms. Morales that she and Ms. Combs were keeping the kids in Delaware because Ms. Morales' grandfather, identified as Henry Walters, was sick and later because he had died. (P Ex. 10, R.R. at 366a-371a.) Appellant testified that Ms. Morales was unsure whether her grandfather's last name was "Walters" or "Waters." (N.T. 8/28/12 at 48.) Appellant testified that she was unable to locate a "Henry Walters" or "Henry Waters" in Delaware with any connection to the people in this case and that she found no potential relatives or associated individuals with ties to Delaware in her background check of Ms. Morales. (P Ex. 16, Ms. Morales' LexisNexis Background Check, R.R. at 381a-392a; N.T. 8/28/12 at 45, 48-49, 184.) Appellant testified that she found no record of a "Johnnie Mae Walters." (N.T. 8/28/12 at 127.) Appellant testified that she contacted Delaware State Police and that they were unable to find a record of a new silver Envoy with Delaware tags. (N.T. 8/28/12 at 75, 127, 154.) Appellant testified that the Delaware number Ms. Morales had provided as the number

17

"Johnnie Mae Walters" and Ms. Combs had called from was the number for ICA Americas, Inc., and that she did not notice that the final four digits of the Delaware number were identical to the final four digits of the Philadelphia number Ms. Morales had provided for Ms. Combs. (N.T. 8/27/12 at 203-204; N.T. 8/28/12 at 73-74.)

Prior to swearing out the affidavit of probable cause for Ms. Combs' arrest, Appellant was unable to corroborate any of the information provided by Ms. Morales and Appellant consistently uncovered information that conflicted with what Ms. Morales reported. (N.T. 8/28/12 at 105-106, 133.) Appellant also learned that Ms. Morales had a number of aliases and a criminal record which included charges for fraud and theft. (P Ex. 15, Morales' Criminal Record, P Ex. 16, R.R. at 376a-392a; N.T. 8/28/12 at 41-42, 139.) Appellant did not speak to Officer Lee, the officer who took the initial report of the missing twins. (N.T. 8/27/12 at 75, 95-96, 115.) Appellant did not interview Ms. Morales a second time and testified that her sole contact with the parents after her initial interview of Ms. Morales was a few telephone calls between Mr. Beamer and herself. (N.T. 8/28/12 at 87, 110-111; *see also* Beamer Dep. at 69, 86, R.R. at 332a, 349a.)

A reasonable jury could conclude that Appellant lacked probable cause for the arrest of Ms. Combs and that Appellant's affidavit in support of probable cause effectively precluded the magistrate from making a detached and objective determination that a warrant should be issued for Ms. Combs. *See Hall*, 302 A.2d at 344; *Cosmas*, 660 A.2d at 87 (a determination of probable cause "depends on whether it was reached by fair and complete means, or whether it was a product of some act or omission of defendants that may have tainted the proceedings"). The affidavit states that both parents were interviewed in person.

18

The jury heard evidence to the contrary. The affidavit does not disclose that the only source relied upon for the information contained within its four corners is Ms. Morales. The affidavit conceals the fact that it is based solely on hearsay and double hearsay. The affidavit omits mention of Mr. Beamer's grandmother Thelma and Ms. Comb's neighbor Ms. Doral, making information supposedly gleaned from them appear to have a different source. The affidavit does not disclose that the vehicle described does not exist. The affidavit does not reveal that Appellant could not find a record of "Aunt Johnnie Mae Walters," a record of the supposedly ill father, or a record of a familial relation to Ms. Morales living or having lived in Delaware or a familial relation or associated individual named "Walters." The affidavit offers no hint that even the relatively minor steps Appellant took to corroborate Ms. Morales' statements by running database checks only revealed contradictory information. The affidavit does not contain information known to Appellant that would raise questions concerning the credibility and reliability of Ms. Morales.

Based on the evidence when viewed in the light most favorable to Ms. Combs as the verdict winner, a reasonable jury could conclude that Appellant lacked probable cause to arrest Ms. Combs and that she deliberately misrepresented and withheld material facts to make it appear as though she had probable cause for arrest. Furthermore, because malice can be inferred from a lack of probable cause, the want of probable cause supports a finding of malice. Even if the lack of probable cause alone did not support a finding of malice, a reasonable jury could conclude that Appellant's actions demonstrated a complete disregard for Ms. Combs' rights.

Next, we address whether the Tort Claims Act provides Appellant immunity from liability for malicious prosecution. The Tort Claims Act provides immunity from tort liability for local agency employees acting within the scope of their duties that cause injury to persons or property for which they would otherwise be liable. 42 Pa. C.S. §§ 8541, 8545. However, the Tort Claims Act rescinds immunity for local agency employees who cause an injury to persons or property where it is "judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S. § 8550. Our Supreme Court held in *Renk v. City of Pittsburgh*, 641 A.2d 289 (Pa. 1994), that a judicial finding that a local agency employee committed an intentional tort, alone, is insufficient to establish willful misconduct; instead, the evidence must demonstrate that the local agency employee intended to commit the wrongful act. Following *Renk*, the Tort Claims Act has been interpreted as providing immunity for the intentional tort of a local government employee, such as a police officer, unless there is evidence of willful misconduct aforethought—that the local government employee knew the act was wrong and acted with that knowledge. *Kuzel v. Krause*, 658 A.2d 856, 860 (Pa. Cmwlth. 1995). We conclude that the evidence in the instant matter, when viewed in the light most favorable to Ms. Combs, is sufficient to support the determination of the jury and the Trial Court that Appellant knew her investigation of the missing twins was inadequate and that she did not have probable cause for the arrest of Ms. Combs, and that Appellant acted with this knowledge to cause the arrest of Ms. Combs.

First and foremost, as detailed above, the evidence supports the conclusion that Appellant knowingly made material misrepresentations and

20

omissions in her affidavit of probable cause. However, the record also contained voluminous evidence of Appellant's overall deficient investigation, which supports the conclusion that Appellant's conduct was willful, deliberate and knowing.

The jury heard evidence that Appellant's investigation consisted almost entirely of database searches. The jury heard evidence that Appellant's investigation did not take her past the threshold of the Philadelphia Police Department South Detectives Division. The jury heard evidence that Appellant did not check Ms. Combs' residence, did not interview Mr. Beamer or his grandmother, did not check Kimberly Marable's residence or interview her, and did not speak to the responding officer. In addition, the jury heard evidence that Appellant failed to follow police directives in her investigation of the missing twins.

Appellant testified that she knew what to do when investigating missing persons because the police department has directives and that she is familiar with those directives, including Philadelphia Police Department Directive 51, which identifies steps to follow when investigating missing persons. (P Ex. 40, Directive 51, R.R. at 478-493; N.T. 8/27/12 at 81-82, 115, 216.) Appellant failed to discuss issuing an amber alert with her superiors, Appellant failed to request samples of the twins' DNA, Appellant failed to search the twins' residence, Appellant failed to verify the information provided by Ms. Morales, and Appellant failed to reinterview the parents within seventy-two (72) hours and once a week within the first month of the missing persons reports; each of these steps is identified in Directive 51 as required procedure when persons of tender age are reported missing. (P Ex. 40, R.R. at 478-493; N.T. 8/28/12 at 100, 105-106, 107, 110-111, 206-208.) Appellant did enter the missing twins into the NCIC database

as required by Directive 51, but she testified that she did so because she was directed to by a superior officer, Sergeant Sprawls. (N.T. 8/27/12 at 81-82.)

Appellant's investigation began on the 14th of April 2008 and the warrant for Ms. Combs was issued on the 19th of April 2008. Appellant did not work on the 17th and 18th of April 2008. (N.T. 8/28/12 at 172.) Sergeant Sprawls testified that in a missing persons investigation involving individuals of tender age there should be continuous investigation by other shifts of detectives, even if the assigned detective is off, and that other detectives were available to assist Appellant; Appellant did not request any assistance in her investigation while she was off on the 17th and 18th. (N.T. 8/28/12 at 65-66; N.T. 8/29/12 at 32, 35.) When Sergeant Sprawls reviewed Appellant's file and left her a note asking her about the absence of birth certificates and vital statistics, and who "Grandma Thelma" was, Appellant did not follow up. (P Ex. 29, Spawls Note; N.T. 8/29/12 at 25, 54-55.)

Appellant authored an internal memorandum to update her chain of command on the status of the investigation, entitled a "White Paper," on April 15, 2008. (P Ex. 11, 4/15/08 White Paper, R.R. at 372a; N.T. 8/27/12 at 78-79.) Appellant authored a second White Paper on May 15, 2008. (P Ex. 12, 5/15/08 White Paper, R.R. at 375a.) In the second White Paper, Appellant has corrected Ms. Combs' address, stated she has no further information on "Johnnie Mae Walters or Waters", and noted that she contacted the Postal Inspectors Offices for any possible addresses; otherwise, the two White Papers are almost identical in content, if not form. (P Ex. 12, R.R. at 375a.) Appellant offered conflicting testimony concerning the White Papers, testifying that she may have rewritten the first White Paper because she didn't like the wording and then that she authored an

22

updated White Paper in May because she had a different superior in May than she did in April. (N.T. 8/28/12 at 54-58, at 193-194.) Like the affidavit, the White Papers state that Appellant took actions that the jury had evidence to believe she did not take and the extent to which Ms. Morales is the source for the information in the White Papers is obscured, while the information casting doubt on Ms. Morales' statement is omitted. (P Ex. 11 and 12, R.R. at 372a, 375a.)

Following the issuance of the arrest warrant for Ms. Combs, Appellant's investigation all but ceased. The evidence showed that on May 6th she sent a message to the 19th District asking them to leave a message for Kimberly Marable at her door, but that she did not follow up on this request. (P Ex. 25, 5/6/08 Mssg. to 19th District; N.T. 8/27/12 at 169; N.T. 8/28/12 at 22-23, 186.) On May 13th, Appellant sent a message to the Postal Inspectors Office requesting address information and on May 15th, Appellant authored the second White Paper. (N.T. 8/28/12 at 193.) Thirty days after the twins were reported missing, Appellant was supposed to transfer a copy of her file to the Long Term Missing Persons (LTMP) unit. (N.T. 8/28/12 at 113.) While the LTMP unit requires missing persons files to include birth certificates before it will accept transfer of a file, an officer in the LTMP unit accepted the file as a courtesy to Appellant on the condition that Appellant supplement the file with the birth certificates. (N.T. 8/28/12 at 115-116.) Appellant did not supplement the file with the birth certificates and testified that she never contacted the hospital where the twins were reported to have been born or otherwise attempted to acquire the birth certificates personally. (N.T. 8/28/12 at 116-117.)

After authoring the second White Paper, Appellant did nothing more to investigate the circumstances surrounding the report of the missing twins and in

August 2008 she transferred to the Special Victims Unit. (N.T. 8/28/12 at 97.) However, because Appellant was still responsible for the warrant for Ms. Combs, Appellant was contacted by "Brian" from the fugitive task force in the fall of 2008 to determine the validity of the warrant. (N.T. 8/28/12 at 196, 232-233, 237.) Appellant did not refer him to the LTMP unit. (*Id.*) Appellant did not contact Ms. Morales or Mr. Beamer or conduct any review of her investigation to determine whether probable cause still existed for Ms. Combs' arrest. (*Id.*) Philadelphia Police Department Directive 139 requires that once an arrest warrant is issued, the officer who initiated the arrest warrant shall proceed with "due diligence" to execute the warrant and keep it active by making frequent and thorough attempts to arrest the individual named, and by ensuring every thirty (30) days that the information on which the warrant is based remains reliable and contemporary. (P Ex. 41 Directive 139, R.R. at 495a-506a.) Appellant did not proceed with "due diligence" following the issuance of the arrest warrant for Ms. Combs and when contacted in fall 2008 concerning the viability of the warrant, Appellant made no attempts to comply with Directive 139. (N.T. 8/28/12 at 120-121, 196, 232-233.)

In sum, Appellant offered conflicting testimony, convenient recollections, and scant documentary evidence of her investigation that lacked basic details such as dates of actions taken and the names of individuals she spoke with. Appellant did not follow basic police procedure or direction from her superiors. Appellant made false statements and obscured her lack of investigation in her written reports to her superiors. Appellant made material misrepresentations and omissions in her affidavit in support of probable cause for the arrest of Ms. Combs. The evidence, when viewed in the light most favorable to Ms. Combs, is sufficient to support the conclusion that Appellant knew that her actions were

24

wrong and continued to act despite that knowledge; Appellant is therefore not immune from liability for malicious prosecution under the Tort Claims Act.

Accordingly, because we find no basis upon which to overturn the jury's verdict, the order of the Trial Court denying Appellant judgment notwithstanding the verdict is affirmed.

**JAMES GARDNER COLINS, Senior Judge**

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Joyce Combs                              :
                                          :
                                          :
             v.                     : No. 1561 C.D. 2013
                                          :
Det. Linda Blowes, Badge No. 9107,    :
                                          :
                Appellant          :

## ORDER

AND NOW, this 17th day of February, 2015, the order of the Philadelphia County Court of Common Pleas denying the Motion of Det. Linda Blowes, Badge No. 9107, for Judgment Notwithstanding the Verdict in the above-captioned matter is AFFIRMED.

 

**_____**
**JAMES GARDNER COLINS, Senior Judge**

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joyce Combs        :
            :
     v.      : No. 1561 C.D. 2013
            : Argued:  May 12, 2014
Det. Linda Blowes, Badge No. 9107, :
       Appellant :


BEFORE:  HONORABLE BERNARD L. McGINLEY, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
     HONORABLE JAMES GARDNER COLINS, Senior Judge


<u>OPINION NOT REPORTED</u>


**DISSENTING OPINION BY**
**JUDGE LEADBETTER**       **FILED:  February 17, 2015**


   Detective Blowes' investigation was sloppy without a doubt. However, there is no evidence that she bore any ill feelings toward Ms. Combs, and I do not believe that negligence alone can sustain a charge of malicious prosecution.  *Wagner v. Waitlevertch*, 774 A.2d 1247, 1253 (Pa. Super. 2001) [stating that actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose (internal quotations and citations omitted)].  Accordingly, I must respectfully dissent.


         _____
         **BONNIE BRIGANCE LEADBETTER,**
         Judge